

# In the
# Missouri Court of Appeals
# Western District

THOMAS WILMES AND SHARON
WILMES,

              Appellants,

v.

CONSUMERS OIL COMPANY OF
MARYVILLE,

              Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)

**WD78247**

**OPINION FILED:**
**November 10, 2015**

**Appeal from the Circuit Court of Nodaway County, Missouri**
The Honorable Glen A. Dietrich, Judge

Before Division Three:  Joseph M. Ellis, Presiding Judge, Karen King Mitchell, Judge
and Gary D. Witt, Judge

Appellants Thomas Wilmes ("Thomas")[1] and Sharon Wilmes ("Sharon") appeal from summary judgment entered in favor of Respondent Consumers Oil Company of Marysville ("Consumers Oil") on their petition arising from injuries sustained after a propane explosion on the Wilmeses' property.  Because we agree with the Wilmeses that Consumers Oil was not entitled to judgment as a matter of law, we reverse.

---

[1] Because Thomas and Sharon share the same last name, we refer to them by their first names.  No disrespect or familiarity is intended.

# FACTUAL AND PROCEDURAL HISTORY[2]

In August 2009, Thomas installed a propane system to operate a radiant heater that was placed in an outbuilding (or shed) on the Wilmeses' property. The outbuilding was approximately forty feet wide and sixty feet long. The propane system consisted of a used 500-gallon propane tank, half-inch galvanized piping, and a radiant heater that hung beneath a drop ceiling that covered half of the interior of the outbuilding.

Thomas worked as a building and maintenance supervisor in the course of his employment. Prior to installing the heater, Thomas had a serviceman verify that it was in good working order. Thomas borrowed a tank mover from Consumers Oil to move the propane tank and placed it approximately eight feet from an exterior wall of the outbuilding. Galvanized piping ran from the tank into a trench that was dug from the tank to the outbuilding. The piping entered the building and ran vertically against an interior wall passing through the drop ceiling then turned 90 degrees and went across a short distance above the ceiling and then turned 90 degrees and went back below the ceiling to the heater that hung beneath the ceiling. At the time of the installation, Thomas performed a "leak test" on the system, which means he checked for leaks in the joints by soaping the joints of the system and looking for bubbles while the system was charged.[3] LF 1027.

Thomas pre-paid for 400 gallons of propane from Consumers Oil for delivery at a later date, because it was summer. Thomas was a new propane customer for Consumers

---

[2] "When considering appeals from summary judgments, the Court will review the record in the light most favorable to the party against whom judgment was entered." *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993).

[3] The term "charged" is an industry term meaning the gas was turned on so there was propane in the pipes.

Oil. The used propane tank was empty or very close to empty when Thomas installed the propane system in August. Thomas thought that the tank was running low on propane because it "rolled over in the heater the first time . . . and the second time I lit it, it run out of gas."

On November 10, 2009, David Linebaugh ("Linebaugh"), a delivery man for Consumers Oil, came to the Wilmeses' property to deliver the previously ordered 400 gallons of liquid propane. Thomas left the trench, through which the pipe was located, open so that Consumers Oil could inspect the piping from the tank to the exterior wall of the outbuilding. At the time of delivery, Thomas told Linebaugh that the system was a new installation and asked him to check the line and the heater. Linebaugh visually observed the system and indicated that it was okay. Thomas informed Linebaugh that the heater had "rolled back -- burnt back inside the burner" like it was not getting enough air. Linebaugh replied, "well, that's not that big of deal."

Numerous code requirements are applicable to liquefied petroleum gases and originate from the National Fuel Gas Code drafted by the National Fire Protection Agency ("NFPA"). These requirements were enacted into law pursuant to Section 323.020(2)[4] and are codified in 2 C.S.R. 90-10.020. Relevant to this case, 2 C.S.R. 90-10.020 (1999) regulates the installation of liquefied petroleum gas appliances and gas piping, and 2 C.S.R. 90-10.040 (2001) regulates storage and handling of liquefied petroleum gases. Those C.S.R. provisions incorporate Rules 54 and 58, respectively, of the NFPA's code.

---

[4] All statutory references are to RSMo 2000 as currently supplemented unless otherwise indicated.

Linebaugh filled the tank with the 400 gallons of propane. Linebaugh did not conduct a "leak check" or a "pressure test" on the propane system. A "pressure test" is required by code when there is a new propane gas installation. A "pressure test" is more extensive than a "leak check" because it tests for leaks not only in the joints but also throughout the piping. A "pressure test" checks for leakage by putting pressure with an inert gas to the system at approximately one and one-half times the operating pressure and the system is required to hold that pressure. David Meyer, an expert for the Wilmeses, testified that Thomas's attempt to test-fire the heater was *not* successful operation of the system so as to relieve Consumers Oil of its responsibility to conduct a pressure test because the installation still would be considered new.

Linebaugh provided Thomas with written materials warning about the dangers of propane, which he acknowledges he did not read. However, Linebaugh did not make a record or warn Thomas of several code violations regarding the system. One violation was that the data plate on the propane tank was illegible. The data plate is important in the industry as an indication of the history of the container in part to show that the container has not been designed for a different liquid petroleum gas. Other code violations included that the tank was placed on wood and unfilled cinder blocks, the tank was only eight feet from the side of the building, and there was no manual shut-off valve. The code requires that propane system owners be warned of any deficiencies in the system and that if deficiencies exit, the system must be locked out to prevent its use until the violations are remedied. Rule 58. Finally, Linebaugh did not document that he performed either a "leak check" or a "pressure test." He admits that he did not perform a

4

pressure test. While he maintains he did perform a "leak test" -- a disputed fact -- even if he did perform the test, the failure to document that he did the test is in violation of the code. Rule 54. Meyer testified that the deficiencies in the installation of the system should have put a prudent gas company on notice that even if Thomas represented that he was qualified to install such a system, he may not have been.

Immediately following the propane delivery, Thomas tried the heater, which made a "roaring sound" like it still had air in the line. Thomas turned off the gas at the tank by closing a valve, and then he left for a hunting trip. A few days later, Thomas temporarily returned from the hunting trip. While there, he opened the valve at the tank and lit the heater by turning up a thermostat on an interior wall of the outbuilding. The heater made the same noise, and Thomas, who was in a hurry to return to the hunting trip, adjusted the thermostat temperature so as to turn off the heater. The tank valve was left in the open position at that time. Thomas resumed his hunting trip.

When Thomas returned from the trip the second time, he opened the door, walked into the shop, turned on the light and headed toward the thermostat. After he adjusted the thermostat, he walked about ten feet toward the heater to observe it, and there was an explosion. Thomas was severely burned but survived. He sustained burns over most of his body, the loss of multiple fingers, and injuries to his sternum. He spent 63 days in the hospital, 31 of which were in a coma, and underwent skin grafts and other procedures. He also suffered significant mental anguish and depression.

Maryville police and fire departments responded to the scene within nine minutes and secured the scene within twenty-one minutes. Also within minutes of the explosion,

5

Consumers Oil was notified of the explosion, and the fire department spoke with Linebaugh. (transcript, p. 32) The roof of the outbuilding had been blown off and insulation from the ceiling was on the floor of the outbuilding. The fire captain and other personnel investigated the scene and took pictures that included the heater. The fire department report concluded: "From the nature of the damage with the roof being blown off the cause of the explosion is from an accumulation of propane gas on the attic space." Phillip Rickabaugh ("Rickabaugh"), an officer with the Maryville Public Safety Department in the fire division, concluded that because propane is heavier than air and because it accumulated above the drop ceiling, the propane escaped the system from somewhere in the piping that ran above the drop ceiling -- in other words, the leak would have been above the attic crawl space -- and *not* from the heater unit which was located below the ceiling. Timothy Dunn ("Dunn"), Wilmeses expert, opined by affidavit as follows:

> From the date of the propane delivery, to the time of the incident, Thomas had spent much of the time away from his home, and there is no evidence whatsoever of any alterations being made in the gas piping between those dates. With absolutely no modifications to the gas system after this propane delivery, the piping up to the heater controls would have remained "charged" -- not deactivated or in effect not interrupted -- even when the gas supply had been turned off by Mr. Wilmes, if in fact the [Consumers Oil] had conducted a proper leak check. As such, the closing and opening of the valve on the tank by Mr. Wilmes after [CONSUMERS OIL] delivered the propane did not constitute an installation, modification, repair, or servicing of equipment and appliances within the meaning of the Missouri Propane Safety Act, 323.060.

(Emphasis in original.)

6

Dunn further opined that the propane explosion was

> caused by [CONSUMERS OIL]'s failure to perform an adequate inspection of the tank and propane system before it filled the tank at the [Wilmeses'] residence on November 9, 2009; its failure to perform a leak check before filling the tank with 400 gallons of liquid propane; its failure to lock the system out; and its conduct in filling the tank when the tank and propane piping for the heater failed to comply with provisions of [the NFPA]. Nothing that Thomas Wilmes did in turning the valve for the tank off and on after [CONSUMERS OIL] delivered the propane changed any aspect of the tank or propane system for the heater necessitating that Mr. Wilmes contact [CONSUMERS OIL] again before he turned up the thermostat for the heater shortly before this explosion on November 18, 2009. (LF 1166)

Wilmeses' homeowner's insurance company was notified of the explosion and a representative from the company inspected the damage. Sometime after that, Sharon was concerned that the sight of the debris would upset her husband upon his release from the hospital, so she asked her son and his half-brother to remove it. There was insulation everywhere. Debris was flung for up to a half mile. The heater and piping were significantly damaged. Sharon's son and his half-brother salvaged what they thought could be saved, and threw away or hauled away stuff "because it was a mess." The heater was on the property for up to eight weeks following the incident before the family disposed of it.

On December 19, 2011, the Wilmeses filed suit against Consumers Oil. Sharon included a claim for loss of consortium. The Wilmeses allege that the explosion was the direct result of negligence of Consumers Oil, acting through its agents and servants, in one or more of the following respects: a) failure to properly inspect the tank, b) failure to properly test the tank, c) failure to warn of the dangerous conditions related to the tank, gas piping, and heater, d) failure to train employees on the requirements of NFPA,

7

statutory or legal code requirements or regulations related to the delivery of propane to customers, e) negligence per se in failing to properly inspect and test the tank, gas piping, and heater in violation of the NFPA and state and local law, f) allowing the tank, gas piping, and heater to be used when it knew or could have known that it was not safe to do so, and g) failure to repair or replace defective components of the tank, gas piping, and heater when it knew or could have known that the failure to do so created a risk of an explosion. On January 26, 2012, Consumers Oil answered, asserting several affirmative defenses.

Consumers Oil later filed a motion for summary judgment, along with multiple motions in limine and a motion regarding the spoliation of evidence based on the disposal of the heater, all of which were granted. The Wilmeses appeal from that judgment. Further facts are set forth below as necessary.

**STANDARD OF REVIEW**

Summary judgment shall be entered if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Rule 74.04(c)(6). The moving party bears the burden of establishing a right to judgment as a matter of law. *Id*. A "defending party," who will not bear the burden on the issue at trial, may establish a right to summary judgment by showing (1) facts that negate any one of the elements claimant is required to prove to establish the cause of action, (2) that the non-movant, after an adequate period of discovery, has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find the existence of any one of the necessary elements of claimant's cause of action, or (3) that there is no

8

genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pleaded affirmative defense. *ITT Commercial Fin. Corp. v. Mid-Am. Marine Supply Corp.*, 854 S.W.2d 371, 381 (Mo. banc 1993) (citations omitted).

> When considering appeals from summary judgments, the Court will review the record in the light most favorable to the party against whom judgment was entered. Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. We accord the non-movant the benefit of all reasonable inferences from the record.

> Our review is essentially *de novo*. The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially. The propriety of summary judgment is purely an issue of law. As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment.

*Id.* (citations omitted).

"An abundance of caution must be exercised in granting a motion for summary judgment because it is an extreme and drastic remedy that borders on the denial of due process because the opposing party is denied its day in court." *Jordan v. Peet*, 409 S.W.3d 553, 557 (Mo. App. W.D. 2013) (internal quotation marks and citation omitted). Thus, where the record does not support the granting of summary judgment, we will reverse. *Id*. Summary judgment should be denied where the affidavits or other sworn statements require an evaluative judgment between two rationally possible conclusions, even if the court is convinced the evidence makes it unlikely that a party can prevail at trial. *Reasons v. Union Pacific R.R. Co.*, 886 S.W.2d 104, 107 (Mo. App. E.D. 1994) (citation omitted).

## ANALYSIS

The Wilmeses bring five points on appeal. They argue that the trial court erred in granting summary judgment because 1) Section 323.060 does not bar recovery as a matter of law; 2) Thomas's actions did not constitute an "intervening or superseding cause"; 3) their failure to preserve evidence did not make it impossible for them to prove their case at trial; 4) whether Consumers Oil's warnings were adequate is a jury question; and 5) Consumer Oil's motion for summary judgment should have been stricken for failure to comply with Rule 74.04. We address Points II and III out of order for ease of analysis and need not reach the merits of Point V.

## I.

In their first point, the Wilmeses argue that summary judgment was inappropriate because the affirmative defense raised in Section 323.060.4 does not bar recovery as a matter of law. That provision states as follows:

> No person registered pursuant to this section and engaged in this state in the business of selling at retail of liquefied petroleum gas . . . shall be liable for actual or punitive civil damages for injury to persons or property that result from any occurrence caused by the installation, modification, repair, or servicing of equipment and appliances for use with liquefied petroleum gas by any other person unless such registered person had received written notification or had other actual knowledge of such installation, modification, repair, or servicing of equipment and appliances and failed to inspect such installation, modification, repair, or servicing of equipment and appliances within thirty days after receipt of such notice or actual knowledge.

As a preliminary matter, however, we note that under Rule 55.08, Consumers Oil was required to "set forth all applicable affirmative defenses" and a "short and plain statement of the facts showing that [Consumers Oil] is entitled to the defense." An

10

affirmative defense "seeks to defeat or avoid a plaintiff's cause of action, and alleges that even if plaintiff's petition is true, plaintiff cannot prevail because there are additional facts that permit the defendant to avoid legal responsibility." *City of Peculiar v. Effertz Bros. Inc.*, 254 S.W.3d 51, 59 (Mo. App. W.D. 2008) (citation omitted). "In applying Rule 55.08 and in determining what defenses must be affirmatively pleaded . . . the test applied is whether the defendant intends to rest his defense upon some fact not included in the allegations necessary to support the plaintiff's case." *Id.* "A defendant must plead his affirmative defenses in his answer to the suit or they will be deemed waived." *Peterson v. Discover Prop. & Cas. Ins. Co.,* 460 S.W.3d 393, 411 (Mo. App. W.D. 2010) (citation omitted).

As to its defense under Section 323.060.4, Consumers Oil stated in whole: "For further answer and affirmative defense, defendant states that plaintiffs' claims are barred pursuant to Missouri Revised Statute § 323.060 which provides immunity for LP gas retailers such as the defendant in this litigation." "A pleading is insufficient where it is merely a legal conclusion." *Peterson*, 460 S.W.3d at 411. Consumers Oil utterly failed to plead facts indicating how the statute permits it to avoid legal responsibility and they are not included in the allegations necessary to support the Wilmeses' case. *ITT*, 854 S.W.2d at 383. On this basis alone, Consumers Oil is not entitled to summary judgment on this defense. However, as the Wilmeses did not raise or present this argument to the trial court, we thus address the merits of the issue. *See Day v. deVries and Assoc., P.C.*, 98 S.W.3d 92, 95 (Mo. App. W.D. 2003).

11

The question in this point is whether the trial court's entry of summary judgment was erroneous because Consumers Oil failed to meet its burden as of matter of law by establishing that the statute bars the Wilmeses from recovering actual or punitive civil damages under the facts of this case. There is no question that the evidence, under our standard of review, established that Thomas borrowed the tank mover from Consumer's Oil to install the propane tank and that he informed Linebaugh that this was a new installation when he arrived to fill the tank. Therefore Consumer's Oil had actual knowledge of the fact that this was a new installation at that point in time.

We thus consider whether Consumers Oil conclusively established that Thomas's actions after Linebaugh delivered the propane constituted "installation, modification, repair, or servicing" of equipment under the statute so as to relieve Consumers Oil of liability for actual or punitive civil damages. As this subsection of the statute has never been interpreted, this is an issue of first impression.

"The primary rule of statutory interpretation is to give effect to the General Assembly's intent as reflected in the plain language of the statute at issue." *Ben Hur Steel Worx, L.L.C. v. Dir. of Revenue*, 452 S.W.3d 624, 626 (Mo. banc 2015). When the words of a statute are clear, "there is nothing to construe beyond applying the plain meaning of the law." *Young v. Boone Elec. Coop.*, 462 S.W.3d 783, 791 (Mo. App. W.D. 2015) (*quoting State ex rel. Valentine v. Orr,* 366 S.W.3d 534, 540 (Mo. banc 2012). "If statutory language is not defined expressly, it is given its plain and ordinary meaning, as typically found in the dictionary." *Derousse v. State Farm Mut. Auto. Ins. Co.,* 298 S.W.3d 891, 895 (Mo. banc 2009) (citation omitted).

12

Given that statute does not define the terms "installation, modification, repair, or servicing," then, we turn to the dictionary definitions of these categories to provide insight into whether Thomas's actions constitute activity barred by the statute. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993, Unabridged) provides the following definitions:

"**installation**": "the setting up or placing in position for service or use"

"**modification**": "act or action of changing something without fundamentally altering it" or "the state of being so changed"

"**repair**": "to restore by replacing a part or putting together what is torn or broken"

"**service**" (*vt -ing*): "to provide maintenance for," for example, "dealings with them in the *servicing* of my English car."

Consumer's Oil argues that Tomas's action of turning off the propane tank, turning it back on, and attempting to start the heater fall within the terms of the Section 323.060.4, thus relieving them of liability for the explosion.

To begin, the trial court did not find, and Consumers Oil does not argue, that any of Thomas's actions constituted "installation." More to the heart of the matter, Consumers Oil, which has the burden of proving that its affirmative defense applied, did not present any meaningful analysis of why Thomas' actions otherwise fall within the statute. Specifically, a review of the record and the statute does not support a determination as a matter of law that Thomas acted to "modify" or "change" the propane heating system by attempting to start the heater or by temporarily turning off the gas at

13

the tank.[5]   Nor is there any indication that Thomas acted to "repair" the system by replacing a part or putting together something that was torn or broken.   Finally, Consumers Oil did not meet its burden of proving that Thomas was "servicing" or "provid[ing] maintenance" for the system by the simple action of turning the components on and off.

In so holding, we reject Consumers Oil's additional argument that Thomas's action of turning off the propane tank constituted an "interruption of service" and therefore fell within the term "servicing" under the NFPA and accordingly required him to conduct a new "leak test."   Consumers Oil contends that Thomas's decision not to conduct the "leak test" -- a requirement that the Wilmeses dispute through expert opinion -- somehow brought Thomas's actions within the purview of Section 323.060.4.   This is a red herring. The issue of whether Thomas should have conducted a "leak test" may impact his percentage of fault, if any, but it does not extinguish Consumers Oil's liability under Section 323.060.4.  Legislative intent is determined from the plain meaning of the words used in a statute.  "Installation," "modification," "repair," and "servicing" are not defined terms either in the statute or in the C.S.R., which adopts NFPA standards and which includes several defined terms.[6]  Under the plain language of the statute, turning on and off components of the system does not as a matter of law constitute "servicing" the

---

[5] Every person who has owned a propane grill or operated a propane forklift knows that the propane tank is supposed to be turned off between each operation.

[6] Consumers Oil does not point to any provision where "interruption of service" means "servicing," and our review indicates that the term "servicing" was adopted into the NFPA's glossary in 2013 as meaning "Performing maintenance, recharging, or hydrostatic testing," which is similar to the dictionary definition.  Even if the term "servicing" from Section 323.060.4 were somewhere defined as "interruption of service," however, the question of whether Thomas's actions constituted an "interruption of service" is disputed by expert opinion.

14

system so as to relieve Consumers Oil of the consequences of any negligent action it might have performed in course of inspecting the Wilmeses' new installation, including failure to perform a "leak test," a "pressure test," and a lock-out of the propane system to prevent its use until code violations were remedied.

Point I is granted.

## II.

In their third point, the Wilmeses challenge the trial court's entry of summary judgment, arguing that there was sufficient evidence to support the elements of their negligence claim despite an adverse inference regarding the absence of the heater. This point arises from the trial court's ruling that, at Sharon's direction, the incident site was cleaned up and the heater and most of the piping was hauled off to a dump. Consumers Oil argued in its summary judgment motion, "In this matter we are asking the court to dismiss this action because of a failure to produce sufficient evidence because of the spoliation by plaintiffs. Plaintiffs simply cannot make out a prima facie case of negligence because the evidence was destroyed." The trial court ruled that the clean-up was intentional destruction of evidence in a situation where the Wilmeses had a duty or should have recognized a duty to preserve the evidence. Key to this point on appeal, then, the trial court ruled that due to spoliation, the Wilmeses cannot prove all of the elements of their case.

"Spoliation is the intentional act of destruction or significant alteration of evidence." *State ex rel. Zobel v. Burrell,* 167 S.W.3d 688, 691 (Mo. banc 2005). "A party who intentionally destroys or significantly alters evidence is subject to an adverse

15

evidentiary inference under the spoliation of evidence doctrine." *Id.* The destructive act must be intentional; mere negligent destruction of evidence does not constitute spoliation. *Schneider v. G. Guilliams, Inc.,* 976 S.W.2d 522, 527 (Mo. App. E.D. 1998). The spoliator must destroy or alter the evidence under circumstances indicating fraud, deceit, or bad faith. *Id.* "When spoliation is urged as a rule of evidence which gives rise to an adverse inference, it is necessary that there be evidence showing intentional destruction of the item, and also such destruction must occur under circumstances which give rise to an inference of fraud and a desire to suppress the truth." *Morris v. J.C. Penney Life Ins. Co.,* 895 S.W.2d 73, 77-78 (Mo. App. W.D. 1995) (citing *Moore v. General Motors Corp.,* 558 S.W.2d 720, 736 (Mo. App. St. L. 1977)). "In such cases, it may be shown by the proponent that the alleged spoliator had a duty, or should have recognized a duty, to preserve the evidence." *Id.*

The spoliation doctrine and the resulting adverse inference punish the spoliators "by holding them to admit that the destroyed evidence would have been unfavorable to their position." *Id.* However, "the adverse inference does not prove the opposing party's case." *Id.* "Instead, the spoliator is left to determine whether any remaining evidence exists to support his or her claim in the face of the inference. *Id.*

*DeGraffenreid v. H.L Hannah Trucking Co.*, 80 S.W.3d 866, 874 (Mo. App. W.D. 2002), illustrates the spoliation doctrine in operation. In that workers' compensation action, a driver who had suffered a stroke sought telephone logs maintained by his employer, a trucking company, which would demonstrate a federal violation. *Id.* at 873-74. The Commission found that the company's failure to provide the logs triggered the

16

spoliation doctrine and thus that the company was required to admit that driving in excess of federal regulations was a "substantial factor" in the driver's injury. *Id.* at 871. On appeal, we held that the company was deemed only to admit that the destroyed document in question would state what the opposing party claims it states, but was not conclusive as to the ultimate conclusion of the claim. *Id.* Accordingly, it would be presumed that the driver drove in excess of the hours allowed by federal regulations, but the doctrine did not allow the presumption that the violation was a "substantial factor" in the stroke or automatically entitle the driver to benefits. *Id.* at 878.

Thus, although Consumers Oil argued to the trial court that it was entitled to summary judgment based on lack of evidence, *DeGraffenreid* indicates that the proper analysis is whether remaining evidence supports the negligence claim in the face of the inference. *See Schneider*, 976 S.W.2d at 527.

In our *de novo* review of the spoliation issue in this case, we note a misapplication of law by the trial court. The trial court's specific ruling was that at Sharon's direction, the incident site was cleaned up, and "[t]his was intentional destruction of evidence by or on behalf of Plaintiffs, in a situation where Plaintiff had a duty, or should have recognized a duty, to preserve the evidence." The court relied on *Morris* for this proposition. The context of this rule from *Morris*, as set forth above, is that, "an inference of fraud and a desire to suppress the truth" "may be shown by the proponent that the alleged spoliator had a duty, or should have recognized a duty, to preserve the evidence." 895 S.W.2d at 77-78. The inference of fraud, deceit, bad faith, or a desire to suppress the truth is not divorced from the question of whether the spoliator had a duty or

17

should have recognized a duty to preserve the evidence. Rather, whether a spoliator may have had a duty to preserve evidence, for example, in the course of employment or business, *Morris*, *id*., may become part and parcel to a determination of fraud, deceit, bad faith, or a desire to suppress. *Id. See also Moore*, 558 S.W.2d at 735 (holding that there was no evidence of bad faith in the destruction of records where the alleged spoliator did not know it was facing litigation and was not on notice it should not pursue its customary practice of destroying records).

Applying the adverse inference has always required "***more than*** the mere loss or destruction of the evidence." *Id*. at 77. Because the adverse inference is "a harsh rule of evidence, prior to applying it in any given case it should be the burden of the party seeking its benefit to make a prima facie showing that the opponent destroyed the missing records under circumstances manifesting fraud, deceit or bad faith." *Moore*, 558 S.W.2d at 736. In the inquiry of whether Sharon evidenced fraud, deceit, bad faith, or a desire to suppress the truth, the facts must be viewed in the light most favorable to the Wilmeses, and the record does not establish as a matter of undisputed fact that Sharon had a duty or should have recognized a duty not to clean up the remains of a fire and explosion on her property where her insurance company had inspected the site, where Consumers Oil was on actual notice of a propane accident minutes after it occurred, and where the heater -- which appears to be Consumers Oil's key concern -- was left at the accident site for many weeks. Viewing the record in the light most favorable to the Wilmeses, at the time of the clean-up, Sharon and her son only knew that the explosion was likely caused by a gas leak. They had not hired an attorney, an expert or filed suit.

18

Assuming on remand that the record develops so as to support a finding by the trial court of fraud, deceit, bad faith, or a desire to suppress by Sharon in the clean-up of the site, the inference must be correctly applied. The question is not, as argued by Consumer's Oil, whether the Wilmeses can prove all of the elements of their case without the missing heater. More accurately, the question is whether the Wilmeses can prove all of the elements in their case subject to an adverse inference that the heater and piping, if preserved would not have supported Wilmeses theory of the case. The trial court's ruling that the Wilmeses cannot prove all of the elements of negligence without the heater and piping relies upon a portion of the deposition from Meyer, which we expand here for context:

> Q.    And since you've acknowledged I believe that potentially a leak can come from that heater, or potentially in the gas piping, you can't rule in or out either of those. If a professional had come out at Mr. Wilmes' request at any time when he attempted to light that heater and had problems, whatever problem that existed on the day of the accident would have been eliminated. Do you agree?
>
> A.    We don't know what the problem was on the day of the incident. We don't know if it was the heater or if it was something else in the piping. So I can't sit here and say we know it would have been eliminated at the time of the accident. That we can't do. If you want me to assume that the problem is in the heater, I could then say, certainly, if there's a problem in the heater and someone worked on the heater, they would have hopefully corrected that, but that doesn't say that there couldn't have been something else in the heater. We understand that appliances or mechanical components with electrical circuits and any of those components can and do fail at a variety of times.

In its motion for summary judgment, Consumers Oil argued that the Wilmeses knew that Thomas was having problems with this heater. Consumers Oil argued, "So why was the heater destroyed? We think it was to hide what was wrong with the heater."

19

It concluded, "The subject heater was trashed and the shed demolished and rebuilt. Because of this spoliation, Consumers Oil is left to defend itself against rank speculation and guess work." Thus, the spoliation doctrine allows for the inference that, because the Wilmeses removed evidence, the removed evidence would support a finding that there was something wrong with the heater. The question, then, is whether there is a genuine issue of material fact as to Consumer Oil's alleged negligence given that adverse inference so as to survive summary judgment.

"In any action for negligence, the plaintiff must establish that the defendant had a duty to protect the plaintiff from injury, the defendant failed to perform that duty, and the defendant's failure proximately caused injury to the plaintiff." *L.A.C. ex rel. D.C. v. Ward Parkway Shopping Ctr. Co., L.P.*, 75 S.W.3d 247, 257 (Mo. banc 2002) (citing *Lopez v. Three Rivers Elec. Coop., Inc.*, 26 S.W.3d 151, 155 (Mo. banc 2000)).

"Whether a duty exists is purely a question of law." *Id.* "In considering whether a duty exists in a particular case, a court must weigh the foreseeability of the injury, the likelihood of the injury, the magnitude of the burden of guarding against it and the consequences of placing that burden on defendant." *Hoffman v. Union Elec. Co.*, 176 S.W.3d 706, 708 (Mo. banc 2005) (citations omitted). In determining whether a duty exists, courts have "defined foreseeability as the presence of some probability or likelihood of harm sufficiently serious that ordinary persons would take precautions to avoid it." *Lopez*, 26 S.W.3d at 155 (citation omitted). "The existence of a mere possibility is insufficient." *Id.* Rather, "the test is not the balance of probabilities, but of

20

the existence of some probability of sufficient moment to induce the reasonable mind to take the precautions which would avoid it." *Id*.

In this case, in the posture of summary judgment, the record supports a finding that Consumers Oil had duties to the Wilmeses both under the CSR and under the common law such that it should have foreseen that there existed some probability of or likelihood of harm sufficiently serious that ordinary persons would take precautions to prevent it, and the inference that the heater was broken does not impact the Wilmeses' ability to establish that duty. A legal duty "may arise from at least three sources: (1) it may be prescribed by the legislative branch; (2) it may arise because the law imposes a duty based on the relationship between the parties or because under a particular set of circumstances an actor must exercise due care to avoid foreseeable injury; or (3) it may arise because a party has assumed a duty by contract or agreement whether written or oral." *Hackmann v. Mo. Am. Water Co.*, 308 S.W.3d 237, 239 (Mo. App. E.D. 2009). Liquid propane is a dangerous gas, and pursuant to 2 C.S.R. 90-10.020 and 2 C.S.R. 10-040, effective through Section 323.020(2), Consumers Oil had a duty to inspect, warn, and lock-out usage of the system where there were code violations.

Even apart from the code, Consumers Oil owed a common law duty to the Wilmeses under these facts. Absent a particular relationship recognized by law to create a duty, "the concept of foreseeability is paramount in determining whether a duty exists." *Lopez*, 26 S.W.3d at 156. Here, Consumers Oil delivered 400 pounds of a dangerous gas to the site of the propane system that Thomas had newly installed. Thomas left the trench open for Consumers Oil to inspect the piping from the tank to the exterior wall of the

21

outbuilding. At the time of delivery, Thomas informed Linebaugh that the system was a new installation and asked him to check where the new line ran to the wall inside and where it went to the heater and gave him access to the building for the purpose of doing an inspection. Thomas asked Linebaugh to look at the heater and at Thomas's installation. There were numerous obvious problems. Through his employment, Linebaugh was required to record code violations and to shut off access to the propane in the event of any code violations, until they were corrected. Consumers Oil knew or should have been aware, in the course of reasonable diligence, that an injury could occur if it delivered propane to the site of a faulty new installation. It would have been a small burden to conduct the required tests. It would have been a small burden to lock out the system pending compliance with the code. Expert opinion establishes that Consumers Oil should have been on notice even if Thomas had said he was qualified to install such a system and may not have been. Thus, under the facts of this case, we find as a matter of law that Consumers Oil owed the Wilmeses a duty and that the adverse inference does not preclude the Wilmeses' ability to establish that duty.

The question of whether Consumers Oil breached its duty with respect to the particular accident in this case is a question for a jury, *id.* at 157 (citing PROSSER AND KEETON ON THE LAW OF TORTS, § 37, at 237), and there is no argument by Consumers Oil that the adverse inference impinges on the Wilmeses' ability to establish breach of duty.[7]

---

[7] Obviously, analysis as to duty and breach does not apply to the extent of the Wilmeses negligence per se claim. *See Goudeaux v. Bd. of Police Comm'rs of Kansas City*, 409 S.W.3d 508, 512-13 (Mo. App. W.D. 2013).

22

We next address Consumer Oil's argument that an inference that the heater was damaged defeats the Wilmeses' ability to establish causation. "In order to prove a causal connection to establish negligence, the plaintiff must show both causation in fact and proximate cause." *Robinson v. Mo. State Highway & Transp. Comm'n*, 24 S.W.3d 67, 77 (Mo. App. W.D. 2000) (citation omitted). The trier of fact normally decides causation, particularly where reasonable minds could differ as to causation based upon the facts of the case. *Id.* (citations omitted).

> A defendant's conduct is the cause in fact of a plaintiff's injuries where the injuries would not have occurred but for that conduct. Proximate cause is not causation in fact, but is a limitation the law imposes upon the right to recover for the consequences of a negligent act. The requirement of proving proximate cause absolves those actors whom it would be unfair to punish because of the attenuated relation which their conduct bears to the plaintiff's injury. Thus, proximate cause requires something in addition to a "but for" causation test because the "but for" causation test serves only to exclude items that are not causal in fact; it will include items that are causal in fact but that would be unreasonable to base liability upon because they are too far removed from the ultimate injury or damage.

*State ex rel. Missouri Highway and Transp. Comm'n v. Dierker,* 961 S.W.2d 58, 60 (Mo. banc 1998) (citation omitted).

"The practical test of proximate cause is generally considered to be whether the negligence of the defendant is that cause or act of which the injury was the natural and probable consequence." *Lewis v. Biegel*, 204 S.W.3d 354, 362 (Mo. App. W.D. 2006). We determine this by "looking back, after the occurrence, and examining whether the injury appears to be a reasonable and probable consequence of the conduct." *Robinson*, 24 S.W.3d at 77. From the "essential meaning of proximate cause arises the principle that in order for an act to constitute the proximate cause of an injury, *some* injury, if not

23

the precise one in question, must have been reasonably foreseeable." *Id.* (citations omitted; emphasis in original). Foreseeability is not a matter of mathematical certainty as no event is entirely foreseeable. *Id.* "As such, the test for proximate cause 'is not whether a reasonably prudent person would have foreseen the particular injury, but whether, after the occurrences, the injury appears to be the reasonable and probable consequence of the act or omission of the defendant.'" *Id.* "It is only necessary that the party charged knew or should have known there was an appreciable chance some injury would result." *Id.* A "defendant's negligence need not be the sole cause of the injury; it must be one of the causes without which the injury would not have occurred." *Id.* "It is sufficient that it be one of the efficient causes thereof, without which the injury would not have occurred." *Id.*

Viewing the facts in the light most favorable to the Wilmeses, we find that they demonstrated that there was a genuine issue of material fact as to whether the injuries would have occurred but for Consumers Oil's failure to detect code violations, warn the Wilmeses of the code violations, lock out the propane system, and conduct proper testing, even with the adverse inference that the heater was broken. The data plate on the propane tank was not legible, the tank was situated on wood and unfilled cinder blocks, the tank was only eight feet from the side of the building, and there was no manual shut-off valve. All of these are code violations, and a propane system is to be locked out to prevent its use until a code violation is remedied. Even though the explosion that occurred may not have been foreseeable based upon some of these code violations, it is

24

only necessary that Linebaugh "knew or should have known there was an appreciable chance some injury would result." *Robinson*, 24 S.W.3d at 77.

Additionally, and key to this case, Consumers Oil failed to conduct a "leak test" and a "pressure check." A reasonable inference from the record is that these tests would have detected a propane leak in one of the joints or piping based on the fire department's report stating that "[f]rom the nature of the damage with the roof being blown off the cause of the explosion is from an accumulation of propane gas on the attic space," and based on Rickabaugh's conclusion that because propane is heavier than air and because it accumulated above the drop ceiling, the propane escaped the system from the piping that ran *above* the drop ceiling and *not* from the heater unit.

Even applying an adverse inference that the heater was faulty, there is a genuine issue of material fact as to whether Consumers Oil contributed to cause the explosion. The trial court thus erred in its determination that the spoliation doctrine is appropriately applied under these facts on summary judgment and also in its determination that the Wilmeses could not prevail because the heater was destroyed. Rather, the record indicates that a genuine issue of material fact precludes summary judgment in favor of Consumers Oil as to Consumers Oil's negligence even if the adverse inference were applicable.

Point III is granted.

### III.

In their second point, the Wilmeses argue that the trial court erred in granting summary judgment in favor of Consumers Oil on the ground that the Wilmeses' actions

25

did not constitute an intervening or superseding cause as a matter of law because turning the propane tank off and then on again did not make Consumers Oil's negligence "so remote as to bar recovery as a matter of law."

Before addressing the merits of this point, we note that again, Consumers Oil's pleading of the affirmative defense of an intervening and/or superseding cause is inadequate. For this defense, Consumers Oil stated only "Alleges on information and belief that any injuries or damages allegedly sustained by plaintiffs were proximately caused by intervening and/or superseding causes over which this answering defendant neither controls nor has the right to control." Although Consumers Oil pled some facts relating to a defense of comparative fault and assumption of risk, it set forth no facts relating to its allegation of an intervening and/or superseding cause. As noted above, a "pleading is insufficient where it is merely a legal conclusion." *Peterson*, 460 S.W.3d at 411. As with Point I, on this basis alone, Consumers Oil was not entitled to summary judgment. Again, however, as the Wilmeses did not present this argument to the trial court we address the merits of the issue. *See Day*, 98 S.W.3d at 95.

The key question, then, is whether the trial court erred in granting summary judgment because Consumers Oil failed to meet its burden as of matter of law of establishing that an intervening and/or superseding cause relieved Consumers Oil of liability. As noted above, "[t]he practical test of proximate cause is generally considered to be whether the negligence of the defendant is that cause or act of which the injury was the natural and probable consequence." *Lewis*, 204 S.W.3d at 362 A "court may decide the question of proximate cause when the evidence reveals the existence of an

26

intervening cause that *eclipses the role the defendant's conduct played in the plaintiff's injury*." *Stafford v. Drury Inns, Inc.*, 165 S.W.3d 494, 497 (Mo. App. E.D. 2005) (citation omitted; emphasis added). "The act must be a 'new and independent force which so interrupts the chain of events that it becomes the responsible, direct, proximate and immediate cause of the injury.'" *Lewis*, 204 S.W.3d at 363 (citations omitted).

Put another way, some intervening acts are superseding causes "because they are independent of the original actor's negligence, [so] they are held to sever the connection between the original actor's conduct and the plaintiff's injury as a matter of law." *Vintila v. Drassen*, 52 S.W.3d 28, 41 (Mo. App. S.D. 2001). Negligent conduct that sets in motion a series of events leading to an injury can be interrupted by "an intervening cause which so interrupts the chain of events as to become the responsible, direct, proximate cause of the injury" in which case the conduct renders prior negligence "too remote to operate as proximate cause." *Id.* However, an "intervening cause will not preclude liability where it is itself a foreseeable and natural product of the original negligence." *Id.* (quotations omitted). "Usually, of course, the question of proximate cause (either sole or concurring) is a jury question." *Lewis*, 204 S.W.3d at 363. In other words, the "determination of the proximity of the causal relationship between the negligence and the injury is dependent upon the particular facts of each case, and so is generally an issue reserved for the trier of fact." *Id.*

In this case, as examined above, there is a genuine issue of material fact as to whether Consumers Oil's actions contributed to the Wilmeses' injuries. In brief: the record and reasonable inferences reflect that Consumers Oil failed to lock out the system

27

due to code violations, that Linebaugh failed to conduct a "leak test" and a "pressure check," and that the explosion was due to propane gas accumulation from a pipe above the heater.

Consumers Oil's argument on appeal that its liability was cut off by an intervening or superseding event centers on Thomas's action of turning off the propane tank shortly after Linebaugh's visit and turning it back on without himself conducting a "leak test" or contacting Consumers Oil to conduct such a test. The trial court speculated in its judgment that had Thomas performed the test, "a leak in the system would have been found, the incident would not have occurred and [Thomas] would not have been injured." This is not necessarily true because the evidence suggests that a "leak test" only detects leaks in the joints of the system, and a "pressure check," which Consumers Oil was required in this case to perform, tests for leaks in the joints *and* the pipes.

Our reasoning is supported by Dunn's expert opinion evidence: "Nothing that Thomas Wilmes did in turning the valve for the tank off and on after [Consumers Oil] delivered the propane changed any aspect of the tank or propane system for the heater necessitating that Mr. Wilmes contact [Consumers Oil] again before he turned up the thermostat for the heater shortly before this explosion on November 18, 2009." Even assuming, then, that Thomas failed to detect a leak, there is no indication as a matter of law that his failure was an intervening *cause* that *eclipsed* the role that Consumer Oil's conduct may have played in the explosion. *Stafford*, 165 S.W.3d at 497.

The trial court determined that the summary judgment standard was met regarding the defense of intervening or superseding cause on an alternate theory encompassing

28

Dunn's expert opinion evidence. As noted above, Dunn opined that despite Thomas turning the system off and then on again, the system remained "charged" -- not deactivated or, in effect, the service was not interrupted so as to absolve Thomas of the responsibility of conducting a "leak check." The trial court ruled that the expert opinion "means that there was no leak in the system prior to the incident" and, accordingly, "whatever happened on the date of the incident was completely remote to, and out of the control of the Defendant." The record does not support the conclusion that there was "no leak in the system prior to the incident" simply because the system remained charged. In fact, Dunn's expert opinion attributes the cause of the propane accident in part to Consumers Oil's failure to perform a "leak check" while also recognizing that the system could have remained "charged" even when the gas supply was turned off. Again, Consumers Oil's reasoning fails to account for what a "pressure test," required in this situation, could have revealed as to the pipes. There is thus at least a genuine issue of material fact as to this alternate rationale for summary judgment.

Point II is granted.

## IV.

In their fourth point, the Wilmeses argue that the trial court erred in granting summary judgment regarding their "failure to warn" claim, because whether the warnings were adequate is a question for the jury in that sufficient facts existed in the record for a jury to determine that the warnings were inadequate and because the Wilmeses' failure to read the warnings given does not, of itself, bar recovery under Missouri law.

29

Consumers Oil sought and was granted summary judgment on case law grounded in products liability that addresses both negligent failure to warn and strict liability. *See Smith v. Brown & Williamson Tobacco Corp*., 275 S.W.3d 748, 785 (Mo. App. W.D. 2008) (discussing of negligent failure to warn and strict liability failure to warn in the context of products liability). Presumably based on jurisprudence that a defendant cannot succeed on a failure to warn claim in the context of products liability where the warning would never be heeded, the trial court ruled that "[t]he summary judgment standard is met regarding Plaintiffs' claim based on a failure to warn, because there is no genuine issue of material fact here. Warnings given here were adequate, but it is undisputed that Wilmes did not read them and did not heed them."

On appeal, the Wilmeses argue that the error instead relates to deficiencies with the propane system that should have been obvious to Linebaugh. In that vein, the Wilmeses argue that Consumers Oil failed to provide warnings specific to the deficiencies in this particular propane system. Understanding the trial court's error on this point begins with a review the pleadings. The Wilmeses allege in part that Consumers Oil "failed to warn the Plaintiffs of dangerous conditions related to the tank, gas piping, and heater." Although the trial court confined its ruling to the form warnings surrounding the propane, the pleadings encompass failure to warn of dangerous conditions relating to Linebaugh's inspection of the new installation of the tank, the piping, and the heater and do not sound in products liability jurisprudence. Of course, warnings about these specific code violations were not part of the general, form warnings that Consumers Oil provided to the Wilmeses that may be relevant if this were a products

30

liability claim. The pleadings, then, allege general negligence in Consumers Oil's conduct rather than in a condition with the product itself. *See Woodall v. Christian Hosp. NE-NW*, No. ED 101777, 2015 WL 5025123, at \*7 (Aug. 25, 2015) (noting that where allegations that an injury arose out of landowner's negligent conduct rather than a condition of property itself, a general negligence claim for failure to warn may lie).

Having determined that there are genuine issues of material fact as to general negligence and that Consumers Oil was not entitled to judgment as a matter of law, we reverse on this point as well.

Point IV is granted.

## V.

In their fifth point on appeal, the Wilmeses argue that Consumers Oil failed to comply with various requirements set out in Rule 74.04. Because reversal is necessary on the merits, we decline to review this point.

## CONCLUSION

The judgment of the trial court is reversed and the case is remanded for further proceedings consistent with this opinion.

_____
Gary D. Witt, Judge

All concur

31