

# In the
# Missouri Court of Appeals
# Western District

JAMES C. RHEA, INDIVIDUALLY
AND AS PLAINTIFF AD LITEM FOR
MARGARET RHEA, ET AL.,

              Respondents,

v.

NORMAN SAPP,

              Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)

WD77301

OPINION FILED:  March 3, 2015

**Appeal from the Circuit Court of Henry County, Missouri**
The Honorable Michael C. Dawson, Judge

Before Division Three:  Gary D. Witt, Presiding Judge, Joseph M. Ellis, Judge and
Thomas H. Newton, Judge

This appeal arises from an action for wrongful death brought by the estate of Margaret Rhea ("Rhea") against multiple defendants after her car was struck by a fireman responding to a fire.  The claims against all defendants were settled with the exception of the claims against Norman Sapp ("Sapp"), the individual fireman who caused the accident.  The trial court entered judgment in favor of Rhea, and Sapp brings two points on appeal.  He argues that as a firefighter, he should be shielded from liability and

afforded the protections of either the official immunity doctrine or the public duty doctrine. Because we agree with Sapp that official immunity applies, we reverse.

## Factual and Procedural History[1]

On May 8, 2009, Gilbert Watson ("Watson") was driving a semi tractor-trailer rig with a forty-foot trailer hauling bulls. He was traveling westbound on Missouri Highway 52 between the cities of Deep Water and Montrose.

Watson was passed by another automobile that pulled in front of him, and the driver of that vehicle began abruptly tapping on his brakes to indicate he wanted Watson to stop his vehicle. After stopping, Watson was informed that smoke was coming from the back of his trailer.

Watson went to the back of his vehicle to investigate. He could smell smoke and noticed that the inside tire on the left rear axle was on fire. Watson had a fire extinguisher in his truck that he used to knock the fire down, but the fire reignited. When Watson became unable to extinguish the fire with his extinguisher, he dialed 911 and informed dispatch that a tire on a cattle trailer was on fire, that the trailer contained bulls, and that he was halfway between Deepwater and Montrose on Highway 52. While waiting on emergency responders to help extinguish the fire, Watson used a cup to get water out of the ditch to pour on the burning tire. Rhea was driving eastbound on Highway 52 and saw the cattle trailer on fire in the lane of traffic. She stopped approximately one hundred yards behind it waiting for the highway to clear.

---

[1] The facts are drawn from the Joint Stipulation of Facts that the parties submitted to the trial court as well as from uncontroverted facts in the record.

Sapp has served on the Montrose Fire Department since 1970 and was serving as the chief at the time of these events. Sapp drafted the Department's standard operating procedures approximately ten to fifteen years before litigation of this case. The procedures of the department state that if a fireman was to drive in excess of the rules of the road, he was to engage the vehicle's lights and sirens. Pursuant to the procedures, when a firefighter receives a pager "tone," he or she is expected to respond pursuant to the guidelines, protocols, and statutes in place. He or she is also required to respond in an appropriate manner to the situation depending on the weather conditions and the severity of the situation presented.

Sapp lives on Highway 52 in Montrose. Sapp was at home, sometime around or after 9:15 p.m., when he received a report of a fire on a cattle trailer on westbound Highway 52 halfway between Montrose and Deepwater. Sapp carried the pager utilized by the Montrose Fire Department that communicated verbal information from the dispatcher, and in this instance the pager communicated that a cattle trailer was on fire. When Sapp was dispatched, he was not given instructions on how to respond to the call. Sapp was responding in his capacity as fire chief.

In response to the dispatch, Sapp was driving his personal vehicle, a 2005 Chevrolet pickup that was equipped with a siren and a dashboard light. The siren had a "wail" that produced an up-and-down sound and also a "yelp" that was "ear catching" and high pitched. Sapp went to the scene of the fire with his emergency lights on but did not

3

engage the siren.[2] Sapp had knowledge of Highway 52 at the location where dispatch reported the trailer was located. Prior to responding to the scene of the fire, Sapp had traveled this road hundreds of times. Sapp believed that the highway was narrow at the location where dispatch indicated the fire was located and that a vehicle on fire would potentially block the highway.

The trailer fire was actually much closer to Sapp's location than was reported to him by dispatch. On the way to the scene on Highway 52, Sapp was traveling at approximately 80 miles per hour in a 55 mile per hour zone. He observed several cars stopped in the oncoming lane of traffic.[3] As he proceeded to pass the stationary vehicles in the opposite lane, a person stepped from between the vehicles into his lane of traffic. He moved onto the edge of the roadway to miss the pedestrian and lost control of his vehicle. He overcorrected and traveled back across the center line into the oncoming lane of traffic.

At approximately 9:28 p.m., Sapp's vehicle collided head-on with Rhea's vehicle, which remained stopped approximately one hundred yards behind the burning trailer. She was killed as a result of the collision. Sapp was thrown from his vehicle and severely injured but survived.

In this action for wrongful death, all defendants except Sapp reached a settlement with the plaintiffs concerning the claims against them. Sapp filed a motion for summary judgment, alleging that he was not liable due to both the official immunity doctrine and

---

[2] Sapp testified in his deposition that he intentionally did not use his siren for fear of scaring the bulls in the trailer.

[3] The trailer that was on fire was one of the vehicles he observed, but he did not believe this was the scene of the fire because the location identified by dispatch was further down the highway.

4

the public duty doctrine. That motion was denied. The remaining parties entered into an agreement under Section 537.065[4] and then asked the trial court to rule on "the sole remaining issue" of whether Sapp should be immune from liability pursuant to either "official immunity" or the "public duty doctrine." The parties agreed that Sapp would file a Motion to Reconsider the denial of his prior Motion for Summary Judgment to argue these immunity issues, and they further agreed that the official immunity and public duty determinations by the trial court would be subject to appeal by either party.

The parties prepared a "Joint Stipulation of Facts" which set forth certain limited agreed-upon facts. The parties also submitted a written record that contained portions of multiple depositions that had been taken during discovery, and they filed additional "controverted" and "uncontroverted" statements of fact with supporting documentation. The parties also stipulated that Rhea's damages were in the amount of $618,241 if the defenses were determined by the trial court to be inapplicable. Following additional legal briefing and argument by counsel, the case was submitted to the trial court on these records to determine the sole issue of the application of the defenses. The trial court considered "the parties' oral arguments, legal briefing, written arguments, exhibits and deposition testimony presented with said briefing" and concluded that Sapp was not entitled to a defense on either basis. The court entered judgment for Rhea and awarded damages in the stipulated amount of $618,241. Sapp appeals.

Further facts are set forth below as necessary.

---

[4] All statutory references are to RSMo 2000 as currently supplemented unless otherwise indicated. An agreement pursuant to section 537.065 provides for a claimant and a tort-feasor to settle a claim and contract to limit recovery of damages to specified assets such as insurance coverage.

## Standard of Review

We review *de novo* questions of law decided in court-tried cases. *Pearson v. Koster*, 367 S.W.3d 36, 43 (Mo. banc 2012) (citing *StopAquila.org v. City of Peculiar*, 208 S.W.3d 895, 899 (Mo. banc 2006)). The judgment of the trial court will be affirmed "unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

When a claim of error on appeal presents a mixed question of law and fact, the reviewing court applies the same principles noted above except that it must segregate the parts of the issue that are dependent on factual determinations from those that are dependent on legal determinations. *Pearson*, 367 S.W.3d at 44. "[W]hen presented with an issue of mixed questions of law and fact, a [reviewing court] will defer to the factual findings made by the trial court so long as they are supported by competent, substantial evidence, but will review *de novo* the application of the law to those facts." *Id.* (citation omitted).

"Therefore, it is a matter of deferring to the fact-finder in its assessment of the facts and then applying *de novo* review in determining how the law applies to those facts." *Id.* (citation omitted).[5] In the absence of specific findings of fact, the trial court's

---

[5] Sapp argues that because the case was submitted on stipulated facts to the trial court in a bench-tried case, this case does not involve the resolution of conflicting testimony and thus our review is *de novo*. Rhea argues that our standard of review is *de novo* based on the denial of Sapp's motion for summary judgment. Neither is accurate. The stipulated facts consisted of only two paragraphs of facts relevant to the analysis of the issues presented in this case. Clearly, the court, as it stated in its judgment, considered much more than the two paragraphs of stipulated facts filed by the parties. Certain basic facts were stipulated, others remained disputed, and the record contains numerous uncontroverted facts.

findings are considered as having been found in accordance with the judgment. Rule 73.01(c).

## Analysis

In his first point, Sapp argues that because he was a public employee performing a discretionary duty, he is entitled to official immunity. This judicially-created doctrine "protects public employees from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts." *Nguyen v. Grain Valley R-5 Sch. Dist.*, 353 S.W.3d 725, 729-730 (Mo. App. W.D. 2011) (citing *Southers v. City of Farmington,* 263 S.W.3d 603, 610 (Mo. banc 2008)). "The function of official immunity is to protect individual government actors who, despite limited resources and imperfect information, must exercise judgment in the performance of their duties." *Davis v. Lambert–St. Louis Int'l Airport,* 193 S.W.3d 760, 765 (Mo. banc 2006).

"Whether an act can be characterized as discretionary depends on the degree of reason and judgment required." *Nguyen*, 353 S.W.3d at 729-30 (citing *Southers*, 263 S.W.3d at 610). "A discretionary act requires the exercise of reason in the adaptation of

The court noted that "after extensive briefing by both sides," and after "considering the parties' oral arguments, legal briefing, written arguments, exhibits and deposition testimony presented with briefing," it found that Sapp was "not entitled to the protections of official immunity." As for the denial of summary judgment, Sapp did not appeal the denial of summary judgment; rather, Sapp appealed the court's entry of judgment in Rhea's favor and its conclusion that, based on these facts, Sapp failed to meet his burden of proof and was not entitled to the affirmative defense of official immunity. In essence, this was a trial based on the written record and on limited issues because, while many facts were uncontroverted and no live witnesses were called to testify, some factual and credibility determinations were left to the discretion of the trial court. Thus, we review *de novo* whether the trial court correctly applied the law to the facts as it determined. However, to the extent that the facts of the case were contested, we defer to the trial court's assessment of the contested evidence. *White v. Dir. of Revenue*, 321 S.W.3d 298, 307 (Mo. banc 2010) (citation omitted). Evidence is uncontested when there are stipulated facts or when a party has admitted in his pleadings, by counsel, or through the party's testimony the basic facts of the other party's case. *Id.* at 308.

7

means to an end and discretion in determining how or whether an act should be done or course pursued." *Id.*

"The determination of whether an act is discretionary 'is made on a case-by-case basis, considering (1) the nature of the public employee's duties; (2) the extent to which the act involves policymaking or exercise of professional judgment; and (3) the consequences of not applying official immunity.'" *Id.*

"Official immunity is only available to a public official when he exercises legitimate authority in a discretionary manner." *Id.* at 731 (citing *State v. Edwards*, 337 S.W.3d 118, 121 (Mo. App. E.D. 2011)). "Acts which exceed a public official's legitimate authority are not discretionary and are not protected by official immunity." *Id.* As the party asserting the affirmative defense of official immunity, an individual defendant bears the burden of pleading and proving that he is entitled to that defense. *Id.* at 730 (citing *Black & Veatch Corp. v. Wellington Syndicate*, 302 S.W.3d 114, 127 (Mo. App. W.D. 2009)).

On the other hand, "[a] ministerial act is defined as an act that law directs the official to perform upon a given set of facts, independent of what the officer may think of the propriety or impropriety of doing the act in a particular case." *Jones v. Carnahan*, 965 S.W.2d 209, 213 (Mo. App. W.D. 1998) (citation omitted). It can also be "of a clerical nature" in which "a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his/her own judgment or opinion concerning the propriety of the act to be performed." *Richardson v. Sherwood*, 337 S.W.3d 58, 63 (Mo. App. W.D. 2011) (citing

8

*Southers,* 263 S.W.3d at 610). "Acts which are discretionary are protected, while acts which are ministerial are not; the court must determine whether the challenged act was discretionary or ministerial." *Id.* at 63 (citing *Davis,* 193 S.W.3d at 763).

The general rule as to police officers and other emergency responders is that when they are "driving in non-emergency situations, [they] do not benefit from official immunity." *Davis v. Lambert-St. Louis Int'l Airport,* 193 S.W.3d 760, 763 (Mo. banc 2006). "When an officer is responding to an emergency, however, the officer exercises judgment and discretion and is entitled to official immunity." *Id.* The rationale is that the officer in an emergency situation must use discretion regarding how fast he or she can safely drive in response to the call, the route he or she must take based on the amount of traffic, and the location of the problem. *Id.* Without official immunity, an officer may be overcautious and not act decisively. *Brown v. Tate,* 888 S.W.2d 413, 415 (Mo. App. W.D. 1994). "We grant them immunity in order that they may act decisively, even though they might afterwards, by hindsight, be adjudged to have acted negligently." *Id.* (citation omitted). However, in a non-emergency situation, the operation of a vehicle does not require a public official to exercise policymaking or the exercise of professional expertise or judgment. *Id.*

In *Southers*, a police officer joined a pursuit as the third police vehicle chasing a suspect after the police department was alerted to a robbery. 263 S.W.3d at 607-08. The third officer's action arguably violated the department's vehicular pursuit policy, which limited police pursuits "normally . . . to no more than one primary vehicle and one backup vehicle, unless specifically instructed otherwise. . . ." *Id.* at 608. In the course of

9

the pursuit, the officer in the third vehicle caused an accident. The Supreme Court held that the officer's conduct "was in the course of his official duties and involved the kind of discretionary decisions that require professional expertise and judgment that the official immunity doctrine is intended to protect." *Id.* at 619. Even though there was a violation of the department's policy, the court held he was entitled to the shield of official immunity.

In *Davis*, a police officer responded to an "officer-in-need-of-aid" emergency call. 193 S.W.3d at 763. The court held that the officer exercised judgment in determining which route to take based on the amount of traffic in the area and the location of the officer in need and further that the officer exercised judgment and professional expertise in determining the *speed* he could travel. *Id.* The court concluded that "[i]mposing liability upon the officer in these cases might delay responses to emergency calls, thereby adversely affecting officers or citizens in need of emergency assistance." *Id.*

In *McCormack v. Douglas*, 328 S.W.3d 446 (Mo. App. S.D. 2010), the Southern District of our court considered whether the official immunity doctrine applied in the context of a volunteer firefighter. In that case, the sheriff's department and the fire district were alerted to a car accident. *Id*. at 448. A dispatcher instructed a volunteer firefighter to drive to a fire station to pick up an ambulance-type vehicle and equipment. *Id*. The volunteer traveled from his residence in a vehicle equipped with activated emergency lights and sirens. *Id*. On his way to the fire station, the volunteer collided with a vehicle driven by a police officer, who died as a result of the collision. *Id*. An accident reconstruction report concluded that the collision was "caused by the

10

[volunteer's] failure to stop or slow his vehicle at [a] stop sign." *Id.* at 449. The district's internal policy required firefighters to "come to a complete stop, establish eye contact with drivers of other vehicles, wait two seconds, and then proceed with caution." *Id.*

In an action for negligence, the *McCormack* court reviewed the undisputed facts and held that the volunteer firefighter was entitled to official immunity, noting that there was no willful wrong, bad faith, or malice just because the volunteer violated the district's policy. The *McCormack* court held that, without more, any allegation of a violation of an internal policy is an allegation of negligence, not bad faith, and that the facts of the case "amount to nothing more than negligence during the course of [the volunteer's] duties in the performance of discretionary acts." *Id.* at 451. *See also Bachmann v. Welby*, 860 S.W.2d 31 (Mo. App. E.D. 1993) (reversing trial court and holding that official immunity doctrine applied where officer collided with another vehicle in responding to an all-points-bulletin because speeding was a discretionary act).

Applying those principles to this case, we hold that the trial court erred in entering judgment for Rhea because Sapp sufficiently established that he was entitled to the protection of official immunity. Although the trial court did not make written findings of fact as to whether Sapp was responding to an emergency or whether Sapp's actions were discretionary or ministerial, implicit in its judgment is a determination that Sapp was responding to a non-emergency and/or that his actions were ministerial and not discretionary. Those findings of fact are not supported by competent and substantial evidence, and under these facts the trial court erred as a matter of law in not applying the official immunity doctrine.

11

The parties' relevant stipulated facts, which are folded into the factual and procedural history, *supra*, are these:

> 1.    On May 8, 2009, Norman Sapp, the chief of the volunteer firefighters for Montrose, Missouri, responded to a report of a fire on a cattle trailer on westbound Hwy 52 halfway between Montrose and Deepwater, Missouri.  In actuality, the trailer was less than a mile from Mr. Sapp's house, also located on Hwy 52.
>
> 2.    As Mr. Sapp passed the stopped trailer eastbound at almost eighty miles an hour, he lost control of his truck and crashed into a minivan driven by Margaret Rhea.  Mrs. Rhea's vehicle was parked 100 yards behind the stopped trailer.  Mrs. Rhea was killed as a result of the collision.  Mr. Sapp was thrown from his vehicle but survived.

The record contains additional relevant ***uncontroverted*** facts:  when Watson could not put out the fire with his fire extinguisher, he dialed 911; Sapp had served on the Montrose fire department since 1970 and as a deputy and a reserve deputy for the county since 1986; Sapp was summoned by dispatch; Sapp had knowledge of Highway 52 at the location where dispatch reported the trailer was on fire; Sapp believed the highway was narrow at that location; Sapp believed that a vehicle on fire would potentially block the highway; it was after 9 p.m. at night so it would be dark on the highway.

Here, Sapp acted in the course of his duties as chief of the fire department when he responded to the fire.  Based on the circumstances known to him at the time, Sapp exercised his discretion when he elected to speed while traveling to the fire.  Just as in *Davis*, where the officer exceeded the speed limit in response to an "officer-in-need-of-aid" emergency call, Sapp exercised judgment in determining the speed he could travel in response to a call from dispatch of a fire on a cattle trailer in the middle of the highway. 193 S.W.3d at 763.  And just as in *McCormack*, where a volunteer firefighter elected to

12

run a stop sign in performing tasks he was directed to perform in the course of responding to a call from dispatch, Sapp exercised discretion in choosing to speed to the scene of a fire on a loaded cattle trailer. 328 S.W.3d at 449.

In arguing that Sapp did not establish that he was entitled to official immunity, Rhea correctly notes that we must view the record in the light most favorable to the judgment. In that vein, Rhea cites additional facts from the record in an effort to establish that Sapp was not responding to an emergency and that his actions that night were ministerial. Rhea's arguments are essentially threefold: 1) driving within the speed limit was a ministerial activity for Sapp because the Montrose Fire Department had explicitly dictated a policy that firefighters not exceed the speed limit when responding to alerts; 2) non-emergency driving is not exercising professional expertise and judgment; 3) the facts do not rise to the level of an emergency, but even assuming this was an emergency, the "unique circumstances of this incident removed the need for Sapp's professional expertise."

As to Rhea's first argument, the record indicates that the fire department's written operating procedures and guidelines regarding responding to any calls, including extreme, life-threatening emergencies, required all firefighters to obey all speed laws. Part of the protocol also stated that if a responder exceeded the speed limit, he or she was to engage lights and sirens. That policy is based on the fact that others may need to be alerted that a vehicle is traveling in excess of the normal speed laws. Rhea alleges that Sapp had no discretion to speed (almost eighty miles per hour in a fifty-five mile per hour zone) because of the policy and therefore that his arrival to the fire was ministerial. In a

13

nutshell, the argument is that the internal policy of the fire department removed any discretion that Sapp may have had to exceed the speed limit and therefore that his driving that evening was solely a ministerial act.

Courts have dispensed with Rhea's arguments regarding internal policies. Most bluntly, the *Southers* court held that "[p]ublic employees' conduct that is contrary to applicable statutes or *policies* can constitute evidence that their conduct was negligent, but that conduct does not remove their negligence from the protections of the official immunity or public duty doctrines where the provisions at issue indicate no intent to modify or supersede these common law immunity protections." 263 S.W.3d at 617 (emphasis added). Here, nothing in the departmental policy supplants the common law immunity protections and, accordingly, the official immunity doctrine is unaffected by allegations of policy violations. *See id.* As we are bound to follow the precedent from our Supreme Court in *Southers*, we reject Rhea's argument that the departmental policy removed Sapp's discretion or otherwise rendered Sapp's activity ministerial.

Rhea additionally argues that non-emergency driving is not exercising professional expertise and judgment. As determined above, while this is a correct citation to the law generally, *Davis,* 193 S.W.3d at 763, the uncontroverted facts of this record indicate that Sapp was responding as fire chief to a dispatch report of a fire on a cattle trailer on a narrow two-lane highway after dark. Additionally, Rhea's two cases cited in support of her argument that not all responses are emergency responses do not aid her: *Thomas v. Brandt*, 325 S.W.3d 481, 484 (Mo. App. E.D. 2010), and *Anderson v. Jones*, 902 S.W.2d 889, 890 (Mo. App. E.D. 1995). In *Thomas*, the question was

14

whether emergency medical personnel were facing an emergency when they had **already** arrived at the scene and were working with a patient who was stable; notably, *Thomas* did not involve non-emergency driving. 325 S.W.3d at 482. The *Thomas* court held that the "time and information available to [emergency medical personnel] was more like that of a doctor treating a patient in a hospital than that of an emergency responder arriving to find a patient in critical and devolving condition" such that there was no emergency. 325 S.W.3d at 484-85. In *Anderson*, the court held that there was a genuine issue of material fact as to whether there was an emergency where a witness contradicted the officer's statement that the officer was pursuing a speeding car when he collided with another vehicle. 902 S.W.2d at 890. In other words, the differing accounts of the officer's actions in *Thomas* created a genuine issue of material fact as to whether there was an emergency that prompted the officer's excessive speed. *Id.* at 892. Neither case aids Rhea because here, as explained above, the key uncontroverted facts sufficiently establish that Sapp was responding in his official capacity to an emergency.

Rhea additionally argues that the facts of this case make it "evident and obvious that until Sapp drove his truck onto the scene at eighty miles an hour there was no apparent or imminent threat to life or property to the people and vehicles parked on" the highway. To this end, Rhea contends that the Montrose Fire Department was called to provide backup and support the Deepwater Fire Department, not to fight the fire; that the speed limit was fifty-five miles per hour; that the policy mandated that responders drive the speed limit; that this point on the highway was "open, flat, straight, and unobstructed,

15

allowing anyone approaching the stopped traffic ample and adequate time to slow down";
that Sapp's response required no special skill or expertise.

Again, none of those facts -- even viewing them in the light most favorable to the judgment -- overcome the uncontroverted facts indicating that Sapp was responding to an emergency. Even if Sapp was called to provide backup and support another fire department (and even assuming he knew this was his role), such a fact does not change his actions from discretionary to ministerial. As noted above, the volunteer firefighter in *McCormack* was instructed by dispatch to drive to a fire station to pick up equipment, such that he, too, was providing backup and support for primary responders. To underscore the point, in that case, the firefighter's failure to follow departmental policy as to stop signs caused a fatal wreck while he was undertaking a role in a backup or support position. As noted above, *McCormack*'s facts indicated "nothing more than negligence during the course of [the volunteer's] duties in the performance of discretionary acts." 328 S.W.3d at 451.

Nor can we accept Rhea's invitation to view "unique circumstances of this incident [so as to remove] the need for Sapp's professional expertise." Rhea asks us to determine that the cattle trailer fire on the highway at night was not an emergency because that point on the highway was "open, flat, straight, and unobstructed, allowing anyone approaching the stopped traffic ample and adequate time to slow down"[6] and because Sapp's response required no special skill or expertise. But, although the unique facts may establish

---

[6] We note that dispatch reported the location of the scene to be further down the highway, which is the location that Sapp was responding to when he came upon the actual scene of the fire.

16

negligence such that he could have and should have been driving at a safer speed, neither the unique character of the road nor the fire chief's role as backup to another department changes the nature of Sapp's actions from discretionary to ministerial under the current state of the law.

This point is granted. In this case, under these facts, our holding on this point renders unnecessary a determination of whether the public duty doctrine applies.

## Conclusion

The judgment of the trial court is reversed.

_____
Gary D. Witt, Judge

All concur

17