

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

JANE DOE, BY AND THROUGH    )
HER NEXT FRIEND, JANE DOE GMA,    )
   )
       Respondent,    )
   )
v.    )    WD79064
   )
ALBERTA HUGHES,    )    Opinion filed:  December 20, 2016
   )
       Appellant.    )

**APPEAL FROM THE CIRCUIT COURT OF BUCHANAN COUNTY, MISSOURI**
**THE HONORABLE RANDALL R. JACKSON, JUDGE**

Before Division Three:  Thomas H. Newton, Presiding Judge,
Cynthia L. Martin, Judge and Edward R. Ardini, Jr., Judge

Jane Doe ("Doe") filed suit against Alberta Hughes ("Hughes") claiming negligence resulting in injury to Doe. A jury found in favor of Doe and determined the compensatory damages to be $3,000,000.00, with thirty percent of fault apportioned to Doe's grandmother (her legal guardian). The jury further imposed $6,000,000.00 in punitive damages against Hughes. The trial court entered judgment accordingly. Hughes appeals the denial of her motion for a directed verdict and motion for judgment notwithstanding the verdict, or alternatively, her motion for new trial and remittitur. Finding no error, the judgment of the trial court is affirmed.

**Factual and Procedural Background**

This appeal arises from a suit for negligence filed on behalf of Jane Doe against the appellant Alberta Hughes. Hughes was an employee of Progressive Community Services ("PCS"). PCS is a public entity organized under sections 205.968-73[1] and funded by a tax levy that was approved by Buchanan County voters in 1978. PCS provides services to developmentally disabled residents of Buchanan County, Missouri.

Doe is a developmentally disabled woman, 35 years old at time of trial, with a condition known as Rett's Syndrome, an uncommon progressive genetic neurological disease. She possesses the mental capacity of a two or three year old and suffers from autism, seizures, limited speech capability, and motor discoordination. She lives with her maternal grandmother who is also her legal guardian. Doe began receiving services from PCS in October of 2008, with Hughes acting as her Community Networker. As a Community Networker, Hughes served as Doe's mentor, teacher, peer, and advocate and was responsible for her health, safety, and welfare. Hughes' duties included getting Doe out into the community, which she did by taking her to the local YMCA, the park, and various restaurants, in addition to teaching Doe life skills such as laundry and simple cooking.

Hughes' responsibilities relating to Doe were defined by both general PCS policies as well as a detailed individual care plan developed specially for Doe. Pursuant to PCS policies and the individual care plan, Hughes was required to always be within arm's reach of Doe, was required to be able to reach Doe within ten seconds, was not permitted to take Doe to her home or to provide care for her there, was not to allow third parties to transport Doe, and was required to prepare and submit to PCS observation notes recording the activities she performed with Doe. During the time Hughes served as Doe's caregiver, she knowingly violated many of the requirements. Hughes

---

[1] All statutory citations are to the Revised Statutes of Missouri, 2000, as supplemented.

frequently took Doe to her home and provided care for her there, purposely falsified the records of these incidents to hide the fact that she was providing services from her home, and, on multiple occasions, permitted her husband Tony Hughes ("Husband") to transport Doe. In addition, Hughes discovered, after working with Doe for some time, that Husband was Doe's uncle, which she hid from PCS due to a belief that she would be terminated if PCS became aware of the family relationship.

Of these many indiscretions, the decision to allow Husband to transport Doe proved the most disastrous. Husband had been previously convicted for stealing, tampering with a motor vehicle, and armed robbery, all facts Hughes knew. Hughes also knew that Husband had previously used drugs and admitted that she had feared that his drug use would return. In addition, she had concerns regarding Husband's marital fidelity and sexual predilections. Hughes was even aware that in the past Doe, who could hardly communicate verbally, had grabbed at Husband's penis in a manner that the Husband later told police he did not believe was innocent. However, despite knowledge of Husband's significant and troublesome problems, Hughes willingly violated policy and permitted Husband to transport Doe on multiple occasions, thereby providing the opportunity for Husband to sexually assault her.

In late April of 2013, Doe was taken by her grandmother to see her primary physician Dr. Allen Brewer after she failed to menstruate over a five-month period. Dr. Brewer determined that Doe was pregnant and arranged for an ultrasound and gynecological consultation. The following July, Doe gave birth to a baby girl via caesarian section. Husband was later determined to be the child's biological father. Husband confessed to having sexual intercourse with Doe while transporting her from Hughes' residence to her grandmother's house and subsequently pleaded guilty to the class C felony of sexual assault for which he was sentenced to seven years in prison.

3

In November of 2013, Doe and her baby, both through Doe's grandmother as next friend, as well as her grandmother individually, filed suit against PCS, PCS's executive director Lynn Wells, PCS service coordinator Terri Zeamer, PCS nurse Karla Halter, Hughes, and Husband. All claims brought by Grandmother and Doe's baby were later voluntarily dismissed, as were Doe's claims against Husband. In addition, the trial court dismissed Doe's claims against Nurse Halter for failure to file an affidavit of merit and granted PCS, director Wells, and coordinator Zeamer summary judgment on the basis of sovereign and official immunity. The suit proceeded against Hughes alone and resulted in a four day jury trial bifurcated into a liability and actual damages phase followed by a punitive damages phase. At the close of the evidence, Hughes moved for a directed verdict, which the trial court denied. The jury found in favor of Doe and awarded $3,000,000.00 in compensatory damages, finding Hughes seventy percent at fault and apportioning the other thirty percent of fault to Doe's grandmother. The jury then awarded $6,000,000.00 in punitive damages against Hughes. Hughes moved for a judgment notwithstanding the verdict, or in the alternative a new trial or remittitur, which was denied by the trial court. Hughes timely appealed.

## Discussion

Hughes raises eight points on appeal, which can be broadly grouped into five categories. We will discuss the points raised on appeal in the order most conducive to review.

## I. Official Immunity

In her first point raised on appeal, Hughes argues that the trial court erred in overruling her motion for a directed verdict and motion for judgment notwithstanding the verdict claiming she was protected from liability under the doctrine of official immunity.

4

"Whether immunity applies is an issue of law to the extent that there is no essential dispute as to the operative facts." *Richardson v. Sherwood*, 337 S.W.3d 58, 63 (Mo. App. W.D. 2011). Such questions of law are reviewed *de novo*. *Malam v. State, Department of Corrections*, 492 S.W.3d 926, 928 (Mo. banc 2016). Official immunity is an affirmative defense, and as such, Hughes bears the "the burden of pleading and proving that [she is] entitled to that defense." *Nguyen v. Grain Valley R-5 School Dist.*, 353 S.W.3d 725, 730 (Mo. App. W.D. 2011).

"Official immunity protects public officials from liability for alleged acts of ordinary negligence committed during the course of their official duties for the performance of discretionary acts." *Woods v. Ware*, 471 S.W.3d 385, 391 (Mo. App. W.D. 2015) (quoting *Davis v. Lambert–St. Louis Int'l Airport*, 193 S.W.3d 760, 763 (Mo. banc 2006)). The judicially created doctrine "is intended to provide protection for individual government actors who, despite limited resources and imperfect information, must exercise judgment in the performance of their duties." *Id.* (quoting *Southers v. City of Farmington*, 263 S.W.3d 603, 611 (Mo. banc 2008). Its purpose is to "permit public employees to make judgments affecting public safety and welfare without concerns about possible personal liability." *Id.* (quoting *Southers*, 263 S.W.3d at 611).

Whether official immunity applies turns on whether the public official was engaged in discretionary or ministerial acts. *Southers*, 263 S.W.3d at 610. "Whether an act is discretionary or ministerial depends on the degree of reason and judgment required to perform the act." *Davis*, 193 S.W.3d at 763 (Mo. banc 2006) (internal quotation omitted). An act is considered discretionary if it requires "the exercise of reason in the adaption of means to an end, and discretion in determining how or whether an act should be done or a course pursued." *Id.* (quoting *Rustici v. Weidemeyer*, 673 S.W.2d 762, 769 (Mo. banc 1984)). An act is considered ministerial when it is "of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed

manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." *Id.* (quoting *Rustici*, 673 S.W.2d at 769). "To be liable for official acts, a public employee must violate either a departmentally-mandated duty or a duty imposed by statute or regulation." *Woods*, 471 S.W.3d at 392 (citing *Nguyen*, 353 S.W.3d at 730). "[A] 'departmentally-mandated duty' may clearly arise from sources other than statutes or regulations. Such a duty can arise from departmental rules, the orders of a superior, or the nature of the position for which the defendant was employed." *Id.* at 392-93 (quoting *Nguyen*, 353 S.W.3d at 730). "The determination of whether an act is discretionary or ministerial is made on a case-by-case basis, considering: (1) the nature of the public employee's duties; (2) the extent to which the act involves policymaking or exercise of professional judgment; and (3) the consequences of not applying official immunity." *Id.* at 393 (quoting *Southers*, 263 S.W.3d at 610).

In the present case, no party argues that Hughes was not a public employee capable of receiving official immunity. The only real contention is whether Hughes' actions were discretionary or ministerial in nature. Doe contends that Hughes' duties were laid out in Doe's individual care plan and PCS policies. In particular, she points to the requirement in the individual care plan that Hughes be within arm's reach of Doe at all times and able to reach her within ten seconds, as well as, PCS policies preventing Hughes from administering services in her own home or allowing third parties to transport Doe. Doe contends that Hughes was required to follow these instructions without regard to her own judgment or opinion thus rendering these acts ministerial.

Several cases addressing the application of official immunity to caregivers supports a finding that official immunity is not available to Hughes. *Rush v. Senior Citizens Nursing Home*, for example, concerned a diabetic patient suffering from Alzheimer's dementia who died as a result

of his nurse's failure to follow protocol. *Rush v. Senior Citizens Nursing Home Dist. of Ray County*, 212 S.W.3d 155, 158-59 (Mo. App. W.D. 2006). The patient's doctor had entered an order requiring his blood sugar be tested four times a day and insulin provided pursuant to a sliding scale if over a certain amount. *Id.* at 158. The evidence showed, however, that on multiple days the patient's blood sugar levels had been over the set amount with no insulin being administered by the defendant nurse. *Id.* The court found that the nurse was not "required to exercise any professional expertise or judgment" but rather was required to administer a specific amount of insulin based on the patient's blood sugar level. *Id.* at 161. Thus, the court concluded that the nurse's duty was ministerial and not discretionary.

*Nguyen v. Grain Valley* involved a school nurse who failed to follow proper school district procedures regarding head injuries that led to a wrongful death suit. *Nguyen v. Grain Valley R-5 School Dist.*, 353 S.W.3d 725, 727–28 (Mo. App. W.D. 2011). The court in *Nguyen* noted that the Missouri Supreme Court "has declared that, absent allegations that a state official violated 'either a statutory or departmentally-mandated duty,' a petition's pleadings 'are insufficient to state a claim which is not barred by the doctrine of official immunity as a matter of law.'" *Id.* at 730 (quoting *State ex rel Twiehaus v. Adolf*, 706 S.W.2d 443, 445 (Mo. banc 1986)). The court found, however, that such a departmentally-mandated duty "can arise from departmental rules, the orders of a superior, or the nature of the position for which the defendant was employed." *Id.* The court went on to point out that

> [o]bviously, a janitor employed by the government that defies department rules and/or his supervisor's orders could not be reasonably deemed to be entitled to official immunity when he decides not to post a "wet floor" sign after mopping. The janitor's duty to post such a sign could not be deemed to require "the exercise of reason in the adaptation of means to an end and discretion in determining how or whether an act should be done or course pursued" regardless of whether such action is required by statute or state regulation.

*Id.* at 730-31. Based on these observations, the court concluded that because the school nurse failed to follow district guidelines, and accompanying checklists, regarding the treatment of students suffering from head injuries, the trial court erred in granting the nurse summary judgment based on official immunity. *Id.* at 732.

Hughes ignores *Rush*, *Nguyen*, and similar cases involving caregivers[2] and attempts to find relief in the holdings of *Southers*, *Rhea*, and their kin. This effort is misplaced. *Southers* and its progeny were cases that concerned emergency responders who were involved in collisions while in the act of responding to an emergency. Although the emergency responders in those cases were alleged to have violated department policy and statutory requirements, the courts nevertheless found that when "responding to an emergency…the officer exercises judgment and discretion and is entitled to official immunity." *Rhea v. Sapp*, 463 S.W.3d 370, 376 (Mo. App. W.D. 2015) (quoting *Davis v. Lambert–St. Louis Int'l Airport*, 193 S.W.3d 760, 763 (Mo. banc 2006)); *Southers v. City of Farmington*, 263 S.W.3d 603, 619 (Mo. banc 2008) ("Officer Ratliff's conduct was in the course of his official duties and involved the kind of discretionary decisions that require professional expertise and judgment that the official immunity doctrine is intended to protect. As such, he is shielded from liability in this case by official immunity unless an exception to application of the doctrine applies."). The courts supported their conclusion by pointing out that officers responding to "an emergency situation must use discretion regarding how fast he or she

---

[2] *See, e.g.*, *Richardson v. Burrow*, 366 S.W.3d 552, 556 (Mo. App. E.D. 2012) (paramedic's duty to intubate victim was set by city mandates and was thus ministerial); *Geiger v. Bowersox*, 974 S.W.2d 513, 517 (Mo. App. E.D. 1998) (prison nurse's duties regarding maintenance and administration of inmates' prescriptions were set by prison policy and thus ministerial). There are a number of other cases involving public employees with supervisory responsibility over others that also support the same conclusion. *See, e.g., Harris v. Munoz*, 43 S.W.3d 384, 389 (Mo. App. W.D. 2001) (prison officials' failure to follow prescribed policies concerning the handling of non-contraband inmate property was breach of ministerial duty.) *Davis-Bey v. Missouri Dept. of Correction*, 944 S.W.2d 294, 298 (Mo. App. W.D. 1997) (bus driver in charge of transporting inmates engaged in ministerial action and not insulated from suit by inmate injured when bus rear-ended another vehicle).

can safely drive in response to the call, the route he or she must take based on the amount of traffic, and the location of the problem" and that, as a result, they are granted "immunity in order that they may act decisively, even though they might afterwards, by hindsight, be adjudged to have acted negligently." *Rhea*, 463 S.W.3d at 376 (internal citations omitted). Conversely, "in a non-emergency situation, the operation of a vehicle does not require a public official to exercise policymaking or the exercise of professional expertise or judgment." *Id.* (internal citations omitted); *Southers*, 263 S.W.3d at 619 ("The official immunity doctrine does not apply to police officers responding to non-emergencies, but it does apply if the officers are responding to an emergency."); *Thomas v. Brandt*, 325 S.W.3d 481, 484 (Mo. App. E.D. 2010) ("When publicly-employed emergency medical personnel are treating patients, their negligent acts are protected by official immunity only if they are acting in a true emergency situation.").

Hughes' effort to analogize her conduct to that of an emergency responder is unpersuasive. Hughes was not required to make snap decisions or act decisively to resolve an immediate problem.[3] Much like the hypothetical janitor's duty to place a wet floor sign discussed in *Nguyen*, Hughes' duty to remain in close proximity to Doe and not to let third parties transport her did not require "the exercise of reason in the adaption of means to an end, and discretion in determining how or whether an act should be done or a course pursued." *Davis v. Lambert–St. Louis Int'l*

---

[3] We do not mean to imply that those who are not emergency responders may never receive official immunity protection. In such cases, the question remains whether the acts performed were discretionary or ministerial in nature. Thus, for example, in the case of *Woods v. Ware,* the court found that a wrestling coach was protected by the doctrine as it concluded that the school's policies requiring that students be properly supervised "leave it to the discretion of the wrestling coaches to determine how to supervise students and how to recognize the difference among students and seek to meet their individual needs." *Woods v. Ware*, 471 S.W.3d 385, 393-94 (Mo. App. W.D. 2015). Similarly, in *Warren v. State,* the court found that prison officials were immune from suit by an inmate who was injured using a table saw as the Missouri statute and regulation that were arguably violated required the purchase of "suitable" equipment and "appropriate" safety guards without describing what satisfied "suitable" or "appropriate," leaving that to the discretion of the officials charged with carrying out the duties involved. *Warren v. State*, 939 S.W.2d 950, 953-54 (Mo. App. W.D. 1997). In the present case, by contrast, Hughes' duties, as laid out in the individual care plan and PCS policies, were specific and left no room for interpretation and thus were ministerial in nature.

9

*Airport*, 193 S.W.3d 760, 763 (Mo. banc 2006). The relevant PCS policies and the individual care plan applicable to Doe allowed no flexibility to Hughes to apply her own judgment and therefore constituted ministerial duties.

Even if we were to accept Hughes' strained argument that her actions were discretionary under *Southers*, our conclusion would remain unchanged owing to the willful nature of Hughes' misconduct. The court in *Southers* pointed out that "the doctrine of official immunity will not apply to conduct that is willfully wrong or done with malice or corruption." *Southers v. City of Farmington*, 263 S.W.3d 603, 612 (Mo. banc 2008); *see also, e.g.*, *Blue v. Harrah's North Kansas City, LLC*, 170 S.W.3d 466, 479 (Mo. App. W.D. 2005) ("[O]fficial immunity does not apply to discretionary acts done in bad faith or with malice."); *Stephens v. Dunn*, 453 S.W.3d 241, 250 (Mo. App. S.D. 2014) (same); *Conway v. St. Louis County*, 254 S.W.3d 159, 165 (Mo. App. E.D. 2008) ("There are certain exceptions to official immunity for discretionary acts performed in bad faith or with malice."). Hughes not only violated PCS policy by bringing Doe to her own home and allowing Husband to transport Doe back to her grandmother's house, but also purposely falsified the observation notes she submitted to PCS regarding these activities to conceal the transgressions. Further evidence established that Hughes purposely concealed Husband's family connection to Doe from PCS despite knowing that such family relationships between a caregiver and a client were equally prohibited. Hughes was aware of these policies and that violations could lead to significant consequences, including discharge, and proceeded regardless but took the time to falsify her reports, hoping to avoid recriminations. The conscious choice to lie demonstrates the bad faith implicit in her actions that would serve to strip her of any immunity that may have existed.

The purpose of the official immunity doctrine is to provide protection to public employees who act in good faith to benefit the public welfare in the discharge of their duties but ultimately

10

fail to achieve the highest degree of prudence. *See Woods v. Ware*, 471 S.W.3d 385, 391 (Mo. App. W.D. 2015). It does not apply in situations where a public employee intentionally acts in an improper manner with disregard for the public welfare, or otherwise demonstrates a willingness to subvert the mandates of her employment. Hughes did not simply act or fail to act in the manner required but rather knowingly did so and then went to significant lengths to conceal her noncompliance. The protection of official immunity is not afforded to those that engage in this level of intentional malfeasance.

Hughes' argument that she is entitled to official immunity must therefore necessarily fail on two grounds. First, it was Hughes' responsibility to act as Doe's physical guardian, to remain in close proximity to her, and not to permit transportation by third parties, all tasks that were not subject to her judgment or discretion. As a result, Hughes' duties with regard to Doe's supervision were ministerial, and she is not entitled to official immunity for violating these duties by allowing Husband to transport Doe. Second, the willful nature of her wrongful conduct, confirmed by her considerable efforts to conceal her actions, including the falsification of Doe's observation notes, further renders official immunity unobtainable. For both of these reasons, Hughes' first point on appeal is denied.

## II. Proximate Cause and Foreseeability

Hughes' second point on appeal is that the trial court erred in overruling her motion for a directed verdict and motion for judgment notwithstanding the verdict. arguing a lack of substantial evidence to support a finding that Husband's sexual assault of Doe was foreseeable. Hughes' third point claims error in overruling her motion for a directed verdict and motion for judgment notwithstanding the verdict arising from a lack of substantial evidence to support a finding of proximate cause. These two points share a common core, which leads us to discuss them together.

11

The standards for review for a denial of a judgment notwithstanding the verdict and for review of the overruling of a motion for directed verdict are the same. *Klotz v. St. Anthony's Medical Center*, 311 S.W.3d 752, 769 (Mo. banc 2010) (citing *Giddens v. Kansas City S. Ry. Co.*, 29 S.W.3d 813, 818 (Mo. banc 2000)). In order to survive either motion, the plaintiff must prove they have made a submissible case. *Montgomery v. Wilson*, 331 S.W.3d 332, 336 (Mo. App. W.D. 2011). A case is not considered submissible "unless each and every fact essential to liability is predicated on legal and substantial evidence." *Klotz,* 311 S.W.3d at 769. "In determining whether the evidence was sufficient to support the jury's verdict, the evidence is viewed in the light most favorable to the result reached by the jury." *Id.* This court will reverse the denial of such a motion "only when all of the evidence and the reasonable inferences to be drawn therefrom are so strong against the plaintiff's case that there is no room for reasonable minds to differ" and "[w]e will reverse the jury's verdict for insufficient evidence only where there is a complete absence of probative fact to support the jury's conclusion." *Montgomery*, 331 S.W.3d at 336. (internal citations omitted). Because the question of "whether evidence is substantial and whether any inferences drawn are reasonable is a question of law," our review is *de novo*. *Id.*

In an action for negligence, a plaintiff must establish four elements: "(1) a legal duty of the defendant to protect the plaintiff from injury, (2) breach of the duty, (3) proximate cause, and (4) injury to the plaintiff." *Nickel v. Stephens College*, 480 S.W.3d 390, 400 (Mo. App. W.D. 2015). Hughes raises no contention that she did not owe a duty to Doe, and we find no reason not to conclude the same. Once a duty has been established, the next question is whether the duty has been breached. A breach occurs when a party fails to act according to the relevant standard of care imposed by a duty. *Ostrander v. O'Banion*, 152 S.W.3d 333, 338 (Mo. App. W.D. 2004). In this case, the parties agreed that the applicable standard of care was that of "ordinary care." The

standard of "ordinary care" is one that "requires a defendant to exercise the degree of care of a reasonable person of ordinary prudence under similar circumstances." *Chavez v. Cedar Fair, LP*, 450 S.W.3d 291, 294 (Mo. banc 2014). Combining the foregoing, Hughes breached her duty of ordinary care owed to Doe if "a reasonably prudent person would have [foreseen] danger and provided against it." *O.L. v. R.L.*, 62 S.W.3d 469, 476 (Mo. App. W.D. 2001) (quoting *Scheibel v. Hillis*, 531 S.W.2d 285, 288 (Mo. banc 1976)). As such, "the consideration of breach of duty will involve an integrated assessment of the degree of risk and severity of potential harm and the likelihood that injury may occur absent reasonable precautions." *Id.*

Having established what we must consider, we examine whether there was sufficient evidence for the jury to determine that Hughes should have foreseen the danger to Doe under the circumstances, thus rendering her actions a breach of the duty she owed Doe. Hughes was well aware of Doe's particular vulnerabilities due to her disabilities, possession of the mental capacity of a two or three year old, and other medical frailties. Where the gravity of possible harm is high or the victim particularly vulnerable, a lesser showing of foreseeability is required to establish breach. *See, e.g.*, *id.* at 477 ("[O]rdinary care may require more vigilance and caution when a child is involved if there is a potentially dangerous situation of which a supervisor is or should be aware."). Hughes was also aware that Husband was a felon with convictions for stealing, tampering with a motor vehicle, and armed robbery. In addition, recorded phone conversations between Hughes and Husband established the concerns she held regarding Husband's marital infidelity and her belief that Husband had a "sex problem" as well as the worries she maintained about his past and potential future drug use. Finally, Hughes was aware that Doe had on several occasions grabbed at Husband's penis while he walked by her in their home. With all these considerations in mind, we cannot agree with Hughes' contention that there was "a complete absence of probative

fact to support the jury's conclusion." *Montgomery v. Wilson*, 331 S.W.3d 332, 336 (Mo. App. W.D. 2011).

Foreseeability also arises in the context of the third element of negligence, proximate cause. "In order to prove a causal connection to establish negligence, the plaintiff must show both causation in fact and proximate cause." *Robinson v. Missouri State Highway and Transp. Com'n*, 24 S.W.3d 67, 77 (Mo. App. W.D. 2000) (internal quotations omitted). Causation in fact, sometimes referred to as "but for" cause (or *sine qua non*), is established when it is shown that a plaintiff's injury "would not have occurred but for [the defendant's] conduct." *Id.* "Proximate cause is not causation in fact, but is a limitation the law imposes upon the right to recover for the consequences of a negligent act." *Id.* (internal quotations omitted). Proximate cause is a question normally reserved for the trier of fact and "absolves those actors whom it would be unfair to punish because of the attenuated relation which their conduct bears to the plaintiff's injury." *Wilmes v. Consumers Oil Company of Maryville*, 473 S.W.3d 705, 721 (Mo. App. W.D. 2015). It is determined "by looking back, after the occurrence, and examining whether the injury appears to be a reasonable and probable consequence of the conduct." *Id.* (internal quotations omitted). Stated differently, "in order for an act to constitute the proximate cause of an injury, some injury, if not the precise one in question, must have been reasonably foreseeable." *Id.* "[T]he test for proximate cause is not whether a reasonably prudent person would have foreseen the particular injury, but whether, after the occurrences, the injury appears to be the reasonable and probable consequence of the act or omission of the defendant." *Id.* (internal quotations omitted). "It is only necessary that the party charged knew or should have known there was an appreciable chance some injury would result." *Id.* (internal quotations omitted).

14

It is important to understand the distinction between foreseeability in a proximate cause analysis and foreseeability in a duty or breach analysis. The Missouri Supreme Court has held that "[f]oreseeability for purposes of establishing whether a defendant's conduct created a duty to a plaintiff depends on whether the defendant should have foreseen a risk in a given set of circumstances." *Lopez v. Three Rivers Elec. Co-op., Inc.*, 26 S.W.3d 151, 156 (Mo. banc 2000). When foreseeability is considered in this context, it "is forward-looking." *Id.* "In the context of determining proximate causation, however, foreseeability refers to whether a defendant could have anticipated a particular chain of events that resulted in injury or the scope of the risk that the defendant should have foreseen." *Id.* Thus, in determining proximate cause "foreseeability relies upon hindsight to determine whether the precise manner of a particular injury was a natural and probable consequence of a negligent act." *Id.*

Against this backdrop, there can be no dispute that Hughes' breach of duty was the proximate cause of Doe's injury. Hughes breached her duty of care when she allowed Doe to be transported alone by Husband, in violation of PCS policy and Doe's individual care plan, exposing her to the foreseeable risk that Husband would take advantage of Doe's known vulnerabilities. The harm that resulted from this breach is of the type that occurs when the vulnerable are left alone with the dangerous, thus rendering Hughes' abdication of her duty by abandoning Doe to the custody of Husband the proximate cause of the injury. This harm was not so extraordinary, unpredictable, or attenuated that Hughes should be absolved from her actions, but rather directly arose as the natural outcome of her actions. Hughes' second and third points are denied.

### III. Admissibility of Evidence

Hughes' fifth and sixth points on appeal claim error in the admission of excerpts from recorded telephone conversations between her and Husband while he was incarcerated and the

testimony of Doe's treating physician Dr. Alan Brewer, respectively. In her fifth point, Hughes claims the admission of excerpts from telephone conversations she had with Husband, following his confession to sexually assaulting Doe and subsequent conviction, lacked relevance and was unfairly prejudicial. Hughes further claims in her sixth point that the admission of the testimony of Doe's treating physician consisted of improper opinion testimony as it lacked the necessary foundation.

Because "the determination of whether to admit evidence is within the sound discretion of the trial court," a reviewing court will only reverse the trial court's decision if it finds the trial court abused its discretion. *Elliott v. State*, 215 S.W.3d 88, 92 (Mo. banc 2007). A "trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Dodson v. Ferrara*, 491 S.W.3d 542, 552 (Mo. banc 2016). "If reasonable persons could differ as to the propriety of the trial court's decision, then it cannot be said that the trial court abused its discretion." *Martin v. Martin*, 483 S.W.3d 454, 458 (Mo. App. W.D. 2016).

In order for evidence to be admissible, it must be both logically and legally relevant. *Nolte v. Ford Motor Company*, 458 S.W.3d 368, 382 (Mo. App. W.D. 2014). Evidence is logically relevant if it tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.* (internal quotations omitted). Legal relevance by comparison is based on a "balance between the probative and prejudicial effect of the evidence" *Id.* (internal quotations omitted). This "balancing requires the trial court to weigh the probative value, or usefulness, of the evidence against its costs, specifically the dangers of unfair prejudice, confusion of the issues, undue delay, misleading the

jury, waste of time, or needless presentation of cumulative evidence." *Id.* (internal quotations omitted). "If the cost outweighs the usefulness, the evidence is not legally relevant and should be excluded." *Id.* (internal quotations omitted).

The excerpts from the telephone conversations between Hughes and Husband included several statements concerning beliefs Hughes held regarding Husband's sexual proclivities, marital infidelity, and potential for drug use, as well as her own admissions to falsifying her observation notes submitted to PCS regarding the services provided Doe and that she had been concerned about being terminated for providing services to Doe at her home. While many of the statements involved profanity and did little to portray Hughes in a sympathetic light, they were undoubtedly logically relevant to establishing Hughes' knowledge regarding both the duty she owed to Doe and the danger Husband posed to Doe if permitted to be alone with her. In other words, they were probative in aiding the jury's determination regarding the foreseeability of Husband's actions, which is fundamentally relevant to determining Hughes' liability.[4] Whatever prejudicial effect that may arguably have arisen from the use of these conversations was substantially outweighed by their probative value, and the trial court's decision to admit them cannot be considered so unreasonable and arbitrary as to shock our sense of justice. As such, the trial court did not abuse its discretion in admitting this evidence and Hughes' fifth point is denied.

With regard to Hughes' sixth point relating to the testimony of Dr. Brewer, "[t]he admission and exclusion of expert testimony in civil cases in Missouri is governed by section 490.065." *Kivland v. Columbia Orthopaedic Group*, LLP, 331 S.W.3d 299, 310 (Mo. banc 2011). Under the statute, a circuit court must determine "whether (1) the expert is qualified; (2) the

---

[4] Hughes contends that the excerpts lacked logical relevance because they were made after the incidents and concerned suspicions that Hughes formed in retrospect. The substance of the excerpts, however, plainly revealed beliefs and concerns she held prior to the incidents at issue in this case.

17

expert's testimony will assist the trier of fact; (3) the expert's testimony is based upon facts or data that are reasonably relied on by experts in the field; and (4) the facts or data on which the expert relies are otherwise reasonably reliable." *Id.* "In deciding whether to admit an expert's testimony, the circuit court is required to ensure that all of the statutory factors are met; however, the court is not required to consider the degree to which they are met." *Id.* So long as the trial court finds that the factors are met, the expert is qualified and "any weakness in the expert's knowledge is for the jury to consider in determining what weight to give the expert." *Id.* Thus, any alleged weaknesses in the testimony of the expert go "to the weight that testimony should be given and not its admissibility." *Id.* As such, our courts have held that an "expert's opinion will be admissible, unless the expert's information is so slight as to render the opinion fundamentally unsupported." *Mathes v. Sher Express, L.L.C.*, 200 S.W.3d 97, 111 (Mo. App. W.D. 2006).

Dr. Allen Brewer was Doe's primary physician, and had been for nearly fifteen years. He possessed a medical degree, was a fellow of the American College of Osteopathic Family Physicians, and was board certified in family practice. During trial, Hughes raised no objections to his curriculum vitae or otherwise challenged his medical credentials and does not do so now. As a result, there is little difficulty in determining his qualifications as an expert under section 490.065 based on his "knowledge, skill, experience, training, or education." Dr. Brewer testified based on his observations of Doe as her primary physician, and this testimony was relevant to assist the trier of fact in making their determination regarding Doe's physical, mental, and emotional injuries. Hughes' primary contentions regarding Dr. Allen's testimony concerned the fact that Doe was the only patient he treated with Rett's syndrome, his limited experience in dealing with emotional distress, the fact that he saw Doe in person only twelve times in fifteen years, and his statement that it would be speculation to attribute Doe's behavioral changes to her

18

sexual assault as she did not communicate verbally. All of these factors were relevant in determining what weight to give Dr. Brewer's testimony, and were appropriately probed during his cross-examination. However, they do not render Dr. Brewer's opinion "fundamentally unsupported" and thus inadmissible. *See Mathes,* 200 S.W.3d at 111. Hughes' sixth point on appeal is denied.

### IV. Compensatory Damages

Hughes' seventh point raised on appeal maintains that the trial court erred in overruling her motion for a new trial or remittitur on the basis that the jury's award was so excessive as to demonstrate bias. A claim that the trial court erred in denying motions for a new trial and remittitur is reviewed for an abuse of discretion. *Mackey v. Smith*, 438 S.W.3d 465, 480 (Mo. App. W.D. 2014). The "appellant must show both that the verdict is excessive and that some event occurred at trial that incited the bias and prejudice of the jury." *Id.* (quoting *Giddens v. Kansas City S. Ry. Co.*, 29 S.W.3d 813, 821–22 (Mo. banc 2000)). "The amount of the verdict does not by itself establish bias or passion and prejudice without showing some other error was committed during the trial." *Stewart v. Partamian*, 465 S.W.3d 51, 56 (Mo. banc 2015). In order to warrant remittitur or new trial, the size of the verdict must be "so grossly excessive as to shock the conscience because it is glaringly unwarranted." *Id.* Appellate courts reviewing a jury's verdict must recognize "that the jury retains 'virtually unfettered' discretion in reaching its decision because there is a 'large range between the damage extremes of inadequacy and excessiveness.'" *Id.* at 57 (quoting *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 872 (Mo. banc 1993)). "An appellate court views the evidence in the light most favorable to the verdict and disregards evidence to the contrary." *Id.*

19

While the subject matter of this case might well ignite a passion in the common juror, Hughes fails to demonstrate the jury was biased or prejudiced or that the trial court abused its discretion in denying the motion for new trial or remittitur. On the contrary, the evidence suggests a distinct lack of bias or prejudice. During closing argument, Doe's counsel argued that Husband had sex with Doe at least three times and that for this, coupled with the physical and emotional damages sustained, the jury should award at least $4,000,000.00 in compensatory damages. The jury rejected the argument, instead returning a verdict of $3,000,000.00 and then proceeded to find Hughes only seventy percent at fault thereby reducing the award to $2,100,000.00 dollars. These figures do not suggest bias or prejudice but rather careful consideration and calculation.

Hughes argues that the amount awarded must necessarily be the result of misconduct because there was insufficient evidence to otherwise support such an award. When considering the amount of damages to award, a jury should consider the economic effects of the injury as well as certain "intangible or non-economic damages relating to past and future pain, suffering, effect on life-style, embarrassment, humiliation, and economic loss." *Id.* The jury heard extensive testimony regarding Doe, her general personality including social interactions with others, her distress during medical examinations, details of undergoing a caesarian section and the accompanying recovery, and more. Based on the foregoing, the damages awarded by the jury cannot be said to be without basis or otherwise shocking to the conscience of the court. For this reason, Hughes' seventh point is denied.

### V. Punitive Damages

Hughes' fourth and eighth points concern the award of punitive damages. In her fourth point, she claims the trial court erred in overruling her motion for a directed verdict and motion for judgment notwithstanding the verdict on punitive damages because there was not clear and

convincing evidence that she showed complete indifference or conscious disregard for Doe. In her eighth point, she claims the trial court erred in overruling her motion for a new trial or remittitur as the punitive damages violated her due process rights.

Punitive damages "are not generally recoverable in negligence actions because negligence, a mere omission of the duty to exercise care, is the antithesis of willful or intentional conduct." *Dodson v. Ferrara*, 491 S.W.3d 542, 563 (Mo. banc 2016) (internal quotations omitted). Therefore, in order to establish grounds for punitive damages, the plaintiff must show "clear and convincing proof of a culpable mental state, either from a wanton, willful, or outrageous act, or from reckless disregard for an act's consequences such that an evil motive may be inferred." *Diaz v. Autozoners, LLC*, 484 S.W.3d 64, 88 (Mo. App. W.D. 2015). "An act is committed wantonly if the defendant knows at the time [she] engages in the wrongful act that the act was, in fact, wrongful." *Turner v. Kansas City Public Schools*, 488 S.W.3d 719, 725 (Mo. App. W.D. 2016). Whether sufficient evidence exists to support an award of punitive damages is considered a question of law, however, this court still views "the evidence and all reasonable inferences in the light most favorable to submissibility and [disregards] all evidence and inferences which are adverse thereto." *Diaz,* 484 S.W.3d at 88.

Hughes was aware that the PCS policies and requirements of Doe's individual care plan prohibited services being provided at her home or allowing third parties to transport Doe and required her to be within arm's length of Doe at all times and able to reach her within ten seconds. When she permitted Husband to transport Doe, she was engaging in an act that she knew was directly against her employer's policies and categorically wrong. Hughes knew that these requirements were in place for the protection and well-being of Doe, yet she nevertheless chose to abandon these mandates and placed Doe at profound risk when she permitted Husband to transport

21

Doe. Further, Hughes falsified her observation notes on multiple occasions in an effort to conceal her numerous violations and instances of improper conduct. Clear and convincing evidence of these transgressions presented at trial was sufficient for the jury to find that Hughes' conduct was amply wanton, willful, and performed with conscious disregard to Doe's well-being to justify the imposition of punitive damages. Hughes' fourth point is denied.

The imposition of punitive damages that are grossly excessive may "enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Diaz,* 484 S.W.3d at 90 (quoting *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996)). To determine whether an award is grossly excessive our courts consider three factors: "(1) the degree of reprehensibility of the conduct at issue; (2) the ratio of actual harm to punitive damages; and (3) the difference between the punitive damage award and the civil penalties authorized or imposed in comparable cases." *Id.* The first factor, arguably the most important, is determined by looking at whether:

> [T]he harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Estate of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 373 (Mo. banc 2012) (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409 (2003)). In the present case, the harm caused was almost purely physical and emotional. In addition, Hughes' willful and wanton disregard of PCS policies and Doe's individual care plan evidenced her indifference to or a reckless disregard for the safety and well-being of Doe. The decision to allow Husband to transport Doe was not a single act but rather one that was repeated several times and which resulted in Doe being exposed to harm on multiple occasions. Thus, there was sufficient

22

evidence presented concerning the nature of Hughes' conduct to sustain the award of punitive damages in this case.

The second factor can be somewhat more difficult to answer given that "the Supreme Court has 'consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award.'" *Diaz,* 484 S.W.3d at 90 (quoting *Gore*, 517 U.S. at 582). Here however the ratio is small, and as such, this factor weighs against overturning the award.[5] The final factor is inapposite, as there are no comparable civil penalties that would apply in this case. Given these considerations, the punitive damages that were awarded to Doe were not excessive and were not violative of Hughes' due process rights. Hughes' eighth point is denied.

### Conclusion

The judgment of the trial court is affirmed.

_____
EDWARD R. ARDINI, JR., JUDGE

All concur.

---

[5] Higher punitive damage ratios have been upheld in other cases. *See, e.g.*, *Diaz*, 484 S.W.3d at 91 (roughly 13:1 ratio of punitive to compensatory damages upheld); *Weaver v. African Methodist Episcopal Church, Inc.*, 54 S.W.3d 575, 589 (Mo. App. W.D. 2001) (66:1 ratio of punitive to compensatory damages upheld).

23